Docket No. 104289.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

BRIAN LOMAN *et al.*, Appellees, v. DAVID E. FREEMAN,
Appellant.

*Opinion filed April 17, 2008.*

JUSTICE GARMAN delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Fitzgerald, and Karmeier
concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justice Burke.

Justice Kilbride dissented, without opinion.

**OPINION**

Plaintffs are the owners of a race horse, Master David Lee.
Defendant David E. Freeman, D.V.M., a member of the faculty of the
College of Veterinary Medicine at the University of Illinois, performed
surgery on the horse. Plaintiffs allege that one of the surgical
procedures performed by Freeman was unauthorized and that it
rendered the horse lame and unsuitable for racing. Their claims of
negligence and conversion were dismissed by the circuit court of
Champaign County and they appealed. The appellate court reversed.
375 Ill. App. 3d 445. We granted defendant's petition for leave to
appeal under Supreme Court Rule 315 (210 Ill. 2d R. 315). For the
reasons that follow, we affirm the judgment of the appellate court.

## BACKGROUND

In 2001, plaintiffs brought their horse, Master David Lee, to the Large Animal Clinic at the University of Illinois College of Veterinary Medicine for evaluation and treatment. Defendant was employed by the College as a professor of equine surgery. As such, he was not required to be licensed as a veterinarian in Illinois. See 225 ILCS 115/4(3) (West 2000). His duties included teaching and training veterinary students in the diagnosis and treatment of horses. In the course of his teaching duties, he examined, treated, and performed surgery on horses.

Plaintiffs allege that they gave defendant permission to perform two procedures on the animal: surgery on the left carpal bone and draining of fluid from the right stifle. (The stifle is the joint in a horse's hind leg analogous to the human knee.) They further allege that they specifically forbade him to perform any other procedures on the right stifle. Notwithstanding this express prohibition, defendant performed surgery on the right stifle. Plaintiffs claim that, as a result, the horse has been ruined for future racing.

Plaintiffs' amended complaint contains two counts. In count I, negligence, plaintiffs allege that defendant owed a duty to them to exercise reasonable care in his treatment of the horse "in compliance with the standards of a qualified veterinarian," and that he performed unauthorized and unnecessary surgery on the animal's right stifle "in violation of the standard of care of a veterinarian." In count II, conversion, plaintiffs allege that the performance of unauthorized surgery by defendant "constitutes an unauthorized assumption of the right to possession or ownership of the horse," causing an "alteration of the condition" of the horse.

In addition to the tort claims filed in the circuit court, plaintiffs filed an action against the University of Illinois Department of Clinical Veterinary Medicine (a department within the College of Veterinary Medicine) in the Court of Claims. That action has been stayed pending the outcome of the circuit court action.

Defendant filed a hybrid motion to dismiss pursuant to section 2–619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2–619.1 (West 2004)). In the portion of the motion invoking section 2–619(a)(9) of the Code (735 ILCS 5/2–619(a)(9) (West 2004)

(involuntary dismissal based upon certain defects or defenses)), defendant argued that plaintiffs' negligence claim is barred by Illinois' economic loss, or *Moorman*, doctrine. See *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 73 (1982). In the portion of the motion invoking section 2–615 of the Code (735 ILCS 5/2–615 (West 2004) (motions with respect to the pleadings)), defendant argued that plaintiffs failed to plead a cause of action for conversion because they did not allege that he permanently deprived them of possession of the horse.

The trial court granted defendant's motion and dismissed the amended complaint with prejudice. Plaintiffs appealed. As a threshold matter, the appellate court commented that defendant's motion was not properly designated a hybrid motion pursuant to section 2–619.1 and treated it as a section 2–615 motion. 375 Ill. App. 3d at 448. No issue is raised on this point, so we shall accept the appellate court's characterization of the procedural posture of the case.

As to the negligence claim, the appellate court found that plaintiffs alleged a breach of duty imposed by the common law, independent of defendant's state employment. 375 Ill. App. 3d at 454-55. The appellate court further ruled that plaintiffs' negligence claim is not barred by the *Moorman* doctrine because unauthorized surgery is a sudden and dangerous occurrence. 375 Ill. App. 3d at 458. As to the conversion claim, the appellate court found that the alleged harm – the permanent incapacitation of horse for racing – is sufficient, if proven, to state a cause of action for conversion. 375 Ill. App. 3d at 458.

ISSUES PRESENTED

Defendant raises three issues before this court: (1) whether plaintiffs' negligence claim is barred by the *Moorman* doctrine; (2) whether the Court of Claims has exclusive jurisdiction over plaintiffs' claims because the University of Illinois is the real party in interest; and (3) whether defendant is immune from any liability in connection with his treatment of the horse because he is exempt from all terms of the Veterinary Medicine and Surgery Practice Act of 1994 (Practice Act) (225 ILCS 115/1 *et seq.* (West 2000)).

## STANDARD OF REVIEW

A motion to dismiss under section 2–615 of the Code (735 ILCS 5/2–615 (West 2004)) challenges only the legal sufficiency of the complaint. *Jarvis v. South Oak Dodge, Inc.*, 201 Ill. 2d 81, 85 (2002). As such, an appeal from an order granting such a motion presents a question of law, which we review *de novo*. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). The proper inquiry is whether the well-pleaded facts of the complaint, taken as true and construed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Jarvis*, 201 Ill. 2d at 86.

## ANALYSIS

### (1) Whether Plaintiffs' Tort Claims Are Barred by the *Moorman* Doctrine

In *Moorman Manufacturing Co. v. National Tank Co.*, this court held the purchaser of a defective product may not sue the manufacturer in tort to recover solely economic losses caused by the defect. *Moorman*, 91 Ill. 2d at 88 ("When the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality so that it is fit for ordinary use, contract, rather than tort, law provides the appropriate set of rules for recovery").

In *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146 (1986), this court extended the *Moorman* doctrine to contracts for services, which would seem to include the veterinary care at issue in the present case.

The exception to the doctrine upon which plaintiffs rely was articulated in *Moorman* itself. This court noted that "[t]ort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence \*\*\*. The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract." *Moorman*, 91 Ill. 2d at 86. This court had in mind fires, explosions, or other calamitous occurrences due to the failure of a product and the resulting risk of harm to persons or property. *Moorman*, 91 Ill. 2d at 84-86.

-4-

The circuit court concluded that count I of the amended complaint, negligence, was barred by the *Moorman* doctrine. The appellate court reversed.

With respect to the negligence count, the appellate court found that laceration with a scalpel is "sudden," as compared to the gradual deterioration of the grain storage tank that was at issue in *Moorman*. 375 Ill. App. 3d at 458. The appellate court also reasoned that the occurrence was "dangerous," because surgery is inherently dangerous and because plaintiffs allege that this particular procedure was "very risky." 375 Ill. App. 3d at 458.

We note that application of the "sudden and dangerous" exception to the *Moorman* doctrine to the conduct of one who has contracted to provide a service, as opposed to the failure of a product, is awkward at best. We also observe that the appellate court's reasoning could lead to inconsistent results in similar cases. If veterinary surgery is "sudden and dangerous," the owner of an animal could seek a remedy in tort if he alleged malpractice in the performance of veterinary surgery, but he would be limited by *Moorman* to a contractual remedy if he alleged that the veterinarian misdiagnosed a disease or condition or failed to render the proper nonsurgical treatment. Nevertheless, we find it unnecessary to review the appellate court's reasoning on this issue.

Defendant's petition for leave to appeal lists "*Moorman* Doctrine" as one of the points relied upon for reversal. However, the doctrine is only briefly referred to in the remainder of the petition. Defendant wonders how, if veterinary surgery is sudden and dangerous, it can be expected to be performed in a professional manner. He concludes that he "firmly believes that the *Moorman* Doctrine applies to this set of facts. Veterinary surgery is not sudden nor dangerous to the point that it falls within the ambit of the recognized exception to the Doctrine." In defendant's brief to this court, he did not provide argument in support of these conclusory remarks. Indeed, the sole mention of the *Moorman* doctrine is a statement that plaintiffs have recourse to the Court of Claims, "[w]hether or not the *Moorman* Doctrine applies." Counsel for defendant made no mention of *Moorman* at oral argument.

"A reviewing court is entitled to have issues clearly defined with relevant authority cited." *In re Marriage of Bates*, 212 Ill. 2d 489,

517 (2004). Defendant mentioned the *Moorman* issue, but neither clearly defined it nor argued its merits. We, therefore, find the issue forfeited. See *Bates*, 212 Ill. 2d at 517 (allowing the appellate court judgment to stand where the petitioner "fail[ed] to give this court an adequate basis to grant her relief on this issue").

### (2) Whether the Court of Claims Has Exclusive Jurisdiction Over Plaintiffs' Claims in Tort

Defendant claims the protection of the doctrine of sovereign immunity. Our state constitution abolished this traditional doctrine, "[e]xcept as the General Assembly may provide by law." Ill. Const. 1970, art. XIII, §4. The Court of Claims Act (Act) (750 ILCS 505/1 *et seq.* (West 2004)) is the legislature's exercise of that grant of authority. The Act establishes the Court of Claims to serve as the forum for claims against the state, providing, *inter alia*, that the "court shall have exclusive jurisdiction to hear and determine *** [a]ll claims against the State for damages in cases sounding in tort, if a like cause of action would lie against a private person or corporation in a civil suit." 705 ILCS 505/8(d) (West 2004).

This court has had numerous occasions to consider whether a particular tort action is "against the State" and, therefore, must be brought in the Court of Claims. As a result, the rules governing this inquiry are well established. See, *e.g.*, *Fritz v. Johnston*, 209 Ill. 2d 302 (2004); *Jinkins v. Lee*, 209 Ill. 2d 320 (2004); *Currie v. Lao*, 148 Ill. 2d 151 (1992); *Healy v. Vaupel*, 133 Ill. 2d 295 (1990).

Whether an action is one against the state does not depend on the identification of the parties but, rather, on the "issues involved and the relief sought." Thus, plaintiffs cannot evade the jurisdiction of the Court of Claims by naming a servant or agent of the state as the nominal defendant when the State of Illinois is the real party in interest. *Healy*, 133 Ill. 2d at 308.

When the "issue involved" is the alleged negligence of a state employee, the mere fact that he was acting within the scope of his employment is not sufficient to make the state the real party in interest. *Currie*, 148 Ill. 2d at 158. The proper inquiry is to determine the source of the duty the state employee is charged with breaching. Where the alleged negligence is the breach of a duty imposed on the

employee *solely* by virtue of his state employment, the Court of Claims has exclusive jurisdiction. If, however, the duty that he is accused of breaching is imposed independently of his state employment, the claim may be heard in circuit court. *Currie*, 148 Ill. 2d at 159. Thus, this court concluded that a "State employee who breaches a duty he owes regardless of his State employment is no more entitled to immunity than is a private individual who breaches that same duty." *Currie*, 148 Ill. 2d at 160.

As to the "relief sought," an action naming a state employee as defendant will be found to be a claim against the state "where a judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Currie*, 148 Ill. 2d at 158.

We must, therefore, determine whether a veterinarian employed as a member of the faculty at a state university is bound by a duty of care that arises independently of his state employment. We must also determine whether a judgment against such a defendant could operate to control the actions of the state or subject it to liability.

### (a) *Source of Duty Defendant Is Alleged to Have Breached*

The appellate court held that when one "undertakes to render veterinary services, the common law imposes upon that person a duty to use the same skill and knowledge normally possessed by veterinarians in good standing in similar communities, unless that person represented he or she had greater or less skill or knowledge." 375 Ill. App. 3d at 454. The appellate court concluded, therefore, that defendant's duty to plaintiffs did not arise solely from his position as a member of the faculty at the university, which "merely provid[ed] the occasion for his incurring a duty toward them." As such, he was not performing a uniquely governmental function. 375 Ill. App. 3d at 455.

In reaching this conclusion, the appellate court relied on this court's decisions in *Currie* and *Jinkins*. In *Currie*, an Illinois State Police trooper, Lao, was on duty patrolling Interstate 80. He heard and responded to a call regarding a disturbance in the nearby City of Joliet. He activated his lights and siren, exited the interstate, and headed for the location of the disturbance. After he missed a turn, he made a U-turn that resulted in his traveling the wrong way on a one-

way street. When he made a left turn to leave the one-way street, he collided with the plaintiff's pickup truck. *Currie*, 148 Ill. 2d at 155. This court concluded that the duty the trooper had allegedly breached "did not arise as a result of his employment as a State trooper, but rather arose as a result of his status as the driver of an automobile on a public roadway." *Currie*, 148 Ill. 2d at 161-62. Thus, he "was not performing a uniquely governmental function" at the time of the collision. *Currie*, 148 Ill. 2d at 162. Because it was not within his "normal and official" role as a state trooper to respond to police calls in a nearby jurisdiction with its own police department, he was not protected by sovereign immunity and plaintiff's claim was not a matter for the exclusive jurisdiction of the Court of Claims. *Currie*, 148 Ill. 2d at 162. When he chose to respond to the call, he "was performing the nongovernmental activity of driving a motor vehicle in a routine manner on a public street" (*Currie*, 148 Ill. 2d at 164), and, thus, he owed "the same duty owed by all automobile drivers to their fellow motorists" (*Currie*, 148 Ill. 2d at 163).

We distinguished Lao's situation from that of the officer in *Campbell v. White*, 207 Ill. App. 3d 541 (1991), who was involved in a high-speed chase. In the course of the chase, he struck the suspect's vehicle, causing the suspect's death. We observed that although Officer White "was operating a motor vehicle, he was doing so in a manner in which only a governmental official is authorized to act," and the duty he was alleged to have breached "arose solely as a result of [his] State employment." *Currie*, 148 Ill. 2d at 164, citing *Campbell*, 207 Ill. App. 3d at 555.

Defendant cites *Currie*, but only to note that this court cited *Campbell* therein. Relying on *Campbell*, he argues that, like the officer involved in a high-speed chase, any actions he took while treating plaintiffs' horse were uniquely related to his state employment. At oral argument, counsel for the defendant represented that at the time defendant performed surgery on the animal, students were present and he was teaching. (Counsel explained that these facts have not been pleaded because defendant responded to the complaint by filing a motion to dismiss rather than a responsive pleading.) Counsel also argued that trooper Lao's actions were not unique to his state employment because he was not on duty and he owed a duty of

reasonable care as a citizen, while trooper White was on duty, driving his squad car for a purpose uniquely related to his state employment.

Defendant is mistaken. In both *Currie* and *Campbell*, the defendant police officers were on duty at the time they were involved in automobile accidents. In *Currie*, the on-duty officer was performing the "nongovernmental activity" of driving the wrong way down a city street on his way to a location at which his job did not require him to be. *Currie*, 148 Ill. 2d at 164. In *Campbell*, the on-duty officer was performing the governmental activity of pursuing a fleeing suspect. *Campbell*, 207 Ill. App. 3d at 555.

Even if we accept defendant's assertion that he was teaching students at the time he performed the allegedly unauthorized surgery, his actions are more like those of Officer Lao than those of officer White. Like both officers, defendant was "on duty." That is, he was present at his place of state employment, engaged in his state function of teaching students. When he performed a procedure that the owners of the animal had forbidden, his conduct was like that of Officer Lao, who was acting outside his authority as a state trooper when he caused an accident. Thus, like Officer Lao, whose duty "to refrain from these negligent acts is the same duty owed by all automobile drivers to their fellow motorists" (*Currie*, 148 Ill. 2d at 163), defendant owed a duty to "perform only those nonemergency surgeries to which the owner has consented." 375 Ill. App. 3d at 455.

The appellate court also relied on our decision in *Jinkins*, where we held that a psychiatrist and a licensed clinical professional counselor employed at a state mental health facility owed a duty of care to their patient that arose from their status as professionals, rather than from their state employment. *Jinkins*, 209 Ill. 2d at 334. We rejected the defendants' argument that their only duty to the patient arose from their state employment because they would not have come into contact with him "but for" their employment at a state facility. *Jinkins*, 209 Ill. 2d at 333. We held that because the defendants "were using their professional judgment ***, the source of their duty was their mental health professional status." *Jinkins*, 209 Ill. 2d at 335.

Defendant responds by commenting that while health-care providers have a duty to their patients that "exists above and beyond

any duty unique to state employment," the "duty owed [in this case] involved property, not people."

The appellate court identified several sources of a common law duty of veterinarians: (1) the status of veterinary medicine as a "learned profession," which sets certain standards for its members (375 Ill. App. 3d at 452-53), (2) numerous cases from other jurisdictions that have recognized a common law duty of care applicable to veterinarians (375 Ill. App. 3d at 453-54), (3) cases from our own appellate court that have assumed the existence of a veterinary standard of care (375 Ill. App. 3d at 454), and (4) section 299A of the Restatement (Second) of Torts, defining the standard of conduct for professions or trades (375 Ill. App. 3d at 454).

Defendant argues that he owed no duty of care to plaintiffs or their animal. He rejects the first source listed based on his exemption from the license requirement of the Veterinary Medicine and Surgery Practice Act, which we discuss below.

As to the second source, he argues that this court should give no weight to the decisions of the many other states that impose a duty of care on veterinarians because those states may not have veterinary colleges. We do not find this argument persuasive.

Defendant does not comment on the third source, but we find the appellate cases cited to be of limited value because the duty question was not addressed directly. See *Nikolic v. Seidenberg*, 242 Ill. App. 3d 96, 102 (1993) (adoption contract with animal shelter did not waive right to sue associated veterinarian for negligence); *Jankoski v. Preiser Animal Hospital, Ltd.*, 157 Ill. App. 3d 818, 821 (1987) (damages for loss of companionship were not properly awarded in action against animal hospital and veterinarian for negligently causing the death of plaintiff's dog); *Spilotro v. Hugi*, 93 Ill. App. 3d 837 (1981) (trial court erred by excluding certain testimony of plaintiff's expert witness in malpractice action against veterinarian). We note, however, that these cases are not new and they are not novel. See C. Bailey, Annotation, *Veterinarian's Liability for Malpractice*, 71 A.L.R.4th 811 (1989) (listing cases).

Defendant does not respond to the appellate court's reliance on section 299A of the Restatement (Second) of Torts. This section, entitled "Undertaking in Profession or Trade," provides:

-10-

"Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of Torts §299A, at 73 (1965).

Comment *a* to section 299A notes that the word "skill," as used here, refers to a "special form of competence which is not part of the ordinary equipment of the reasonable man, but which is the result of acquired learning, and aptitude developed by special training and experience." Further, "[a]ll professions, and most trades, are necessarily skilled, and the word is used to refer to the special competence which they require." Restatement (Second) of Torts §299A, Comment *a*, at 73 (1965). It cannot be disputed that a doctor of veterinary medicine is skilled. It is also beyond dispute that the practice of veterinary medicine and surgery is a "profession or trade" (Restatement (Second) of Torts §299A, Comment *b*, at 73 (1965)) and that the medical or surgical treatment of an animal, with or without a contract for such services, is an "undertaking" (Restatement (Second) of Torts §299A, Comment *c*, at 73-74 (1965)).

As the appellate court observed, this court has previously cited section 299A of the Restatement with approval. In *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986), we discussed the burden on the plaintiff in a medical malpractice action to establish "the standard of care against which the defendant physician's alleged negligence is judged." We cited comment *e* to section 299A for the "similar locality" rule, "which requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." *Purtill*, 111 Ill. 2d at 242, citing Restatement (Second) of Torts §299A, Comment *e*, at 74-75 (1965).

In *Advincula v. United Blood Services*, 176 Ill. 2d 1, 23 (1996), this court cited section 299A in support of a statement that the standard of care for all professionals is "the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." We noted that standard of care "is utilized to measure the conduct of a wide variety of both medical and nonmedical professions," including podiatry and dentistry.

*Advincula*, 176 Ill. 2d at 23 (citing *Dolan v. Galluzzo*, 77 Ill. 2d 279, 281 (1979) (podiatric practitioner), and *Rosenberg v. Miller*, 247 Ill. App. 3d 1023, 1028-29 (1993) (dentists)).

We conclude that section 299A of the Restatement (Second) of Torts is an accurate statement of the common law of Illinois with respect to the duty of care owed by members of professions or trades, and we, therefore, agree with the appellate court's holding that a veterinarian owes a duty of care. See C. Bailey, Annotation, *Veterinarian's Liability for Malpractice*, 71 A.L.R.4th 811, §2(a) (1989) (noting that "the gravamen of such an action is that in providing veterinary care, the veterinarian failed to use such reasonable skill, diligence, and attention as might ordinarily have been expected of careful, skillful, and trustworthy persons in the profession"). Thus, the duty owed by defendant arises independently of his employment by the state and he was not performing a "uniquely governmental function" (*Jinkins*, 209 Ill. 2d at 335) when he treated plaintiffs' horse.

Defendant protests that the appellate court's recognition of a common law duty of veterinarians "raises all animals–from domestic pets to investments such as race horses–to the same level or plane as human beings." We note, however, that comment *c* to section 299A states that "[i]n the ordinary case, the undertaking of one who renders services in the practice of a profession or trade is *a matter of contract* between the parties, and the terms of the undertaking are either stated expressly, or implied as a matter of understanding." (Emphasis added.) Restatement (Second) of Torts §299A, Comment *c*, at 73-74 (1965). This statement implicates the *Moorman* doctrine. In the typical case, a veterinarian will be providing care to an animal after having formed a contractual relationship with the owner of the animal. Thus, even though the veterinarian is subject to a duty of care, the owner may be limited to a contractual remedy for any breach of duty. The appellate court in the present case held that plaintiffs' claim comes within an exception to the *Moorman* doctrine so that they are not limited to a breach of contract claim. For the reasons explained previously, we express no opinion on this issue.

-12-

(b) *Whether the Relief Sought Would Operate to Control the Actions of the State or Subject It to Liability*

The relief sought by plaintiffs is money damages for two types of loss: the reduction in the fair market value of the horse and the revenue lost as a result of the horse's inability to race. Plaintiffs argue that a judgment in their favor will not control the actions of the state and will not subject the state to liability.

At oral argument, counsel for defendant averred that if the defendant were to be found liable in tort and if the plaintiff were awarded such damages, the University would indemnify defendant. In *Jinkins*, the defendant state employees did not argue that the state's statutory duty to indemnify them (see 5 ILCS 350/2(a) (West 2004) (Indemnification Act)) would make the state liable for any judgment against them. Nevertheless, this court remarked, in a footnote, that the appellate court had, in two previous cases, rejected this argument "based on the distinction between liability and indemnification." *Jinkins*, 209 Ill. 2d at 336 n.2 (citing *Janes v. Albergo*, 254 Ill. App. 3d 951, 965-66 (1993), and *Kiersch v. Ogena*, 230 Ill. App. 3d 57, 63-64 (1992)).

In the present case, the appellate court cited *Jinkins*, *Janes*, and *Kiersch* in support of its conclusion that a judgment against defendant, "in itself, would not subject the state to liability." 375 Ill. App. 3d at 456. We agree.

In *Kiersch*, the defendant was being provided legal representation and indemnification by his employer, Illinois State University, in keeping with the University's policy and the Indemnification Act. The appellate court rejected defendant's argument that a state university's providing legal representation and indemnification to its employees transformed all suits against university employees in their individual capacities into suits against the state. *Kiersch*, 230 Ill. App. 3d at 63. Indemnification, which is the statutory or contractual obligation of the indemnitor to reimburse the indemnitee for his loss, is not the same as liability, which is a legal obligation or responsibility enforceable by civil remedy or criminal punishment.

The statutory duty to indemnify runs from the state employer to the state employee. In contrast, liability is imposed on the tortfeasor himself, not upon the party who indemnifies him. As the appellate

court observed in *Janes*, "the State's obligation to indemnify its employees for liability incurred by them does not constitute the State's assumption of direct liability." *Janes*, 254 Ill. App. 3d at 965.

This distinction is further enforced by the language of the Indemnification Act itself, which provides in section 2(d) that "unless *the court or jury finds* that the conduct or inaction which gave rise to the claim or cause of action was intentional, wilful or wanton misconduct and was not intended to serve or benefit interests of the State, the State shall indemnify the State employee for any damages awarded and court costs and attorneys' fees assessed as part of any final and unreversed judgment, or shall pay such judgment." (Emphasis added.) 5 ILCS 350/2(d) (West 2004). Jury trials are not available in the Court of Claims. *Kiersch*, 230 Ill. App. 3d at 64. See also *Seifert v. Standard Paving Co.*, 64 Ill. 2d 109, 120 (1976) (the lack of a provision for jury trials before the Court of Claims does not violate the state constitutional guarantee of the right to trial by jury). Thus, the Indemnification Act anticipates that there will be cases tried in the circuit court in which a state employee will be found liable and, unless the court or jury finds that his actions were wilful or wanton, he will be indemnified by the state. If the availability of indemnification were sufficient to confer exclusive jurisdiction in the Court of Claims, there would be no role for a jury. *Janes*, 254 Ill. App. 3d at 966.

We agree with the appellate court that a judgment against defendant would not subject the state to liability.

The appellate court also rejected the premise that a judgment against defendant in circuit court would operate to control the state. "Surely," the appellate court remarked, "the College of Veterinary Medicine does not have a policy of performing unauthorized surgeries." 375 Ill. App. 3d at 455.

In *Jinkins*, we considered whether a judgment against a psychiatrist and a counselor employed by a state mental health facility would operate to control the actions of the state. The defendants asserted that a judgment for the plaintiff, the administrator of the estate of a deceased patient, might cause the state to change its policies so that health-care professionals would be required to involuntarily admit individuals to state mental health facilities as a precautionary measure, even if admission was not necessary. This, they argued, could increase the number of lawsuits brought by

involuntarily admitted patients and place a strain on scarce resources. *Jinkins*, 209 Ill. 2d at 336.

We found the argument "speculative" and without basis in the record. And, in any event, we noted that judgment for the plaintiff would merely have had the effect of reinforcing the policy, expressed in state law, that requires "both state and private institutions to devote resources and fashion policy to adhere to the standard of care." *Jinkins*, 209 Ill. 2d at 337, citing 20 ILCS 1705/4.1 (West 1996). We concluded that a judgment for the plaintiff would not operate to control the actions of the State, which would continue to make policy decisions and expend resources in keeping with "the goal of meeting the standard of care already directed by existing state law." *Jinkins*, 209 Ill. 2d at 337.

In *Fritz,* we formulated the "operate to control" inquiry as whether a verdict for the plaintiff in circuit court " 'would limit the employee's ability to engage in lawful activity on behalf of the State.' " *Fritz*, 209 Ill. 2d at 315, quoting *Wozniak v. Conry*, 288 Ill. App. 3d 129, 133 (1997). We concluded that if the allegedly tortious acts of a state employee "cannot properly be characterized" as lawful actions on behalf of the state, then a circuit court judgment that would tend to curb such actions does not violate sovereign immunity.

We agree with the appellate court that a judgment against defendant will not operate to control the state or limit the ability of a member of the veterinary faculty of the University of Illinois to engage in lawful activity.

Thus, the Court of Claims does not have exclusive jurisdiction over a claim that a veterinarian employed by the state has breached the duty of care applicable to veterinarians because that duty arises from the common law, independently of state employment, and a judgment against such a veterinarian will neither operate to control the state nor subject the state to liability.


(3) Whether Defendant Is Immune From Liability

Defendant argues that notwithstanding any duty that might be imposed upon veterinarians under state law, he is immune from liability because he is "completely and utterly exempt from the provisions" of the Practice Act. Specifically, he points to section 4 of

the Practice Act, which states that "Nothing in this Act shall apply to *** (3) Veterinarians employed by colleges or universities or by state agencies, while engaged in the performance of their official duties." 225 ILCS 115/4(3) (West 2000). This provision, according to defendant, evinces a legislative intent to exempt professors of veterinary medicine not only from the license requirement (225 ILCS 115/3(b) (West 2000)), and the continuing education requirement (225 ILCS 115/16 (West 2000)), but from even forming a "veterinarian client-patient relationship" as that term is defined in the statute (225 ILCS 115/3(a)(G) (West 2000)).

Plaintiffs respond that the Practice Act is a licensing statute, not a tort immunity act. The exemption in section 4(3) is, in plaintiffs' view, "intended to allow Illinois universities to attract and employ learned professionals in veterinary science, without imposing the additional burden of acquiring an Illinois license, or being subject to a regulatory agency."

We agree. Defendant's argument is, in effect, that the only source of duty for a member of a licensed and regulated profession or occupation is the governing statute and that, therefore, one who is exempt from the statute cannot be held to a standard of care in the practice of his profession or occupation.

The Practice Act is codified in chapter 225 of the Illinois Compiled Statutes, which is titled "Professions and Occupations." This chapter codifies the licensing and regulation of a multitude of occupations including acupuncture (225 ILCS 2/1 (West 2004)), funeral directors and embalmers (225 ILCS 41/1–1 (West 2004)), professional boxers and wrestlers (225 ILCS 105/1 (West 2004), as well as physicians (225 ILCS 60/1–1 (West 2004)), and dentists (225 ILCS 25/1 (West 2004)). If we were to accept defendant's reading of the Practice Act, we would also have to conclude that the only duty that may apply to any member of any of the regulated occupations and professions arises through the statute.

For example, section 17 of the Illinois Dental Practice Act lists 10 separate acts that constitute the practice of dentistry. 225 ILCS 25/17 (West 2004). Section 17 further provides that the practice of dentistry by a clinical instructor in the course of his or her teaching duties in an approved dental school or college is "exempt from the operation of this Act" if either of two conditions is met. 225 ILCS 25/17(d) (West

2004). Under defendant's reasoning, a clinical instructor of dentistry who is exempt from the licensing provision of the Dental Practice Act would owe no duty to his dental patients to exercise the same degree of skill and knowledge as licensed members of the profession. Such a result would be absurd.

Defendant asks this court to infer a legislative intent to grant tort immunity to a certain class of people in the absence of express statutory language granting such immunity. Our research reveals no authority for making such an inference and defendant cites none. Our constitution, however, contains a guarantee that "[e]very person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, §12.

When the legislature intends to confer immunity from tort liability, it is likely to do so expressly. See, *e.g.*, 225 ILCS 25/36 (West 2004)) (granting immunity from civil or criminal liability for good-faith reporting of any violation of the Dental Practice Act); 225 ILCS 60/30 (West 2004) (granting immunity from civil liability to physician who provides emergency care under the Good Samaritan Act); 620 ILCS 20/3 (West 2004) (extending immunity under Local Governmental and Governmental Employees Tort Immunity Act to airport employees). Because of the constitutional guarantee of a certain remedy for every legal wrong, we will not imply tort immunity in the absence of such express language.

We, therefore, conclude that section 4(3) of the Practice Act is intended to exempt certain veterinarians from the license requirement and other requirements of the act, but not to provide immunity from liability in tort for those exempted. Defendant is not immune from liability.


(4) Whether Plaintiffs Have Stated a Claim for Conversion

Under its analysis of the *Moorman* issue, the appellate court considered both the negligence count and the conversion count. With respect to the conversion count (which was dismissed by the circuit court on other grounds), the appellate court reasoned that defendant's "duty to refrain" from operating on the horse's right stifle "did not

arise exclusively from the service contract." 375 Ill. App. 3d at 457. Because defendant performed the surgery in violation of an express instruction from the plaintiffs, it was outside the scope of the parties' contract and, therefore, not barred by *Moorman*. The appellate court concluded that:

> "Contract or no contract, if one cuts, carves, lacerates, incises, or otherwise alters someone else's property except as authorized by that person, one commits a classic tort: either trespass to chattels or conversion, depending on the extent of the alteration." 375 Ill. App. 3d at 458.

As noted above, defendant has forfeited consideration of the *Moorman* issue before this court, so we turn to the question whether plaintiffs have stated a cause of action for conversion.

"To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114 (1998).

In count II of their amended complaint, plaintiffs alleged that they were the owners of the horse with the "absolute and unconditional right to immediate possession of the horse," and that a demand for possession of the horse would have been "useless" because the defendant could not have returned their personal property to them "in its unaltered state." With regard to the element of assumption of control, dominion, or ownership, the plaintiffs alleged that defendant's performing unauthorized surgery, in violation of their express instructions, constituted "an unauthorized assumption of the right to possession or ownership of the horse."

Defendant's motion to dismiss argued that count II failed to plead a cause of action for conversion because plaintiffs did not allege that he had "permanently deprived them of possession of the horse." The circuit court granted the motion, dismissing the conversion claim with prejudice.

The appellate court reversed, relying on section 226 of the Restatement (Second) of Torts, which provides: " 'One who intentionally destroys a chattel or so materially alters its physical

condition as to change its identity or character is subject to liability for conversion to another who is in possession of the chattel or entitled to its immediate possession.' " 375 Ill. App. 3d at 458, quoting Restatement (Second) of Torts §226, at 439 (1965). Comment *d* to this section suggests that a claim for conversion of a horse on the basis of physical injury to the animal is not unheard of and that one may indeed be liable for the conversion of a horse without permanently depriving the owner of possession: " 'If a horse is permanently lamed, it remains a horse, the owner may still be in possession, and the horse may have value to a glue works, but it has become useless for the ordinary purposes of a horse. In such a case there is a conversion.' " 375 Ill. App. 3d at 458, quoting Restatement (Second) of Torts §226, Comment *d*, at 440-41 (1965). Thus, the appellate court concluded, the claim for conversion was properly pleaded.

In the portion of their brief addressing the *Moorman* issue, plaintiffs argue that the doctrine does not bar a claim for the intentional tort of conversion. They argue, further, that the appellate court was correct that their amended complaint did state a claim for conversion. They also point out that defendant failed to raise any issues related to the conversion claim in his petition for leave to appeal.

Nevertheless, we have a duty to consider *sua sponte* whether the Court of Claims has exclusive jurisdiction with respect to the conversion claim. *Eastern v. Canty*, 75 Ill. 2d 566, 570 (1979) (explaining that a court has a duty to examine its jurisdiction, even if no question is raised by the parties).

Section 8(d) of the Act confers exclusive jurisdiction upon the Court of Claims "in cases sounding in tort." 705 ILCS 505/8(d) (West 2004). This provision is not limited to claims of negligence. By its plain language, this section applies to all tort claims, including intentional torts such as trespass to chattel and conversion.

We noted in *Healy*, 133 Ill. 2d at 309, that an action is against the state when there is " 'no allegation[ ] that an agent or employee of the State acted beyond the scope of his authority through wrongful acts." The essence of a claim for conversion is an allegation that the defendant engaged in an intentional, wrongful act.

-19-

Further, regarding the relief sought, holding the defendant liable for the intentional tort of conversion cannot operate to control the actions of the state because the University simply cannot have a policy requiring its employees to commit the intentional tort of conversion. Further, as noted above, the State's indemnification of defendant, should he be found liable for conversion, will not operate to control the actions of the State.

We therefore, conclude, that plaintiffs' claim for conversion should not have been dismissed by the circuit court.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court, without having reached the question whether plaintiffs' negligence claim is barred by the *Moorman* doctrine, which reversed the dismissal of both counts of the amended complaint and remanded the cause to the circuit court for further proceedings.

*Affirmed.*

JUSTICE FREEMAN, dissenting:

I cannot join in the court's opinion because it does not adequately address the issues that have been raised with respect to count I. One of the main reasons why this is so is because the court cannot decide whether count I, ostensibly for "negligence," is really a contract claim. The court appears to treat it as both. Slip op. at 4, 6, 12. Specifically, in section (1) of its analysis, the court states that the *Moorman* doctrine applies to service contracts, "which would seem to include the veterinary care at issue in the present case." Slip op. at 4. Two pages later, however, the court, in addressing the jurisdictional issue, speaks of the analysis used in determining "whether a particular *tort action* is 'against the State' ***." (Emphasis added.) Slip op. at 6. If the court believes that the parties' relationship is that of a service contract, as alluded to on page 4, then why is the court talking about a tort action on page 6? This same type of contradiction continues throughout the opinion. On page 12, for example, the court holds that the duty of care in this case arises from notions founded in tort law, but, later, the same page it states that the relationship between the

parties is a "contractual" one. Slip op. at 12. These types of internal inconsistencies indicate to me that we need to more carefully examine the nature of the claim alleged in count I. The best way to do this, in my view, is to identify the precise nature of the relationship between the parties. The reward of such an analysis would be an opinion that cleanly resolves the central issues–the jurisdictional question, as well as the application of the *Moorman* doctrine.[1] I, therefore, respectfully dissent.

An unfortunate byproduct of the court's belief that defendant's brief does not adequately address the *Moorman* issue (slip op. at 5-6) is that the reinstatement of count I is left standing. This is so despite the fact this court has never addressed the question of whether a general negligence claim is the proper legal vehicle to compensate animal owners such as plaintiffs. This is particularly disappointing

---

[1]I strongly disagree that it is "unnecessary" for the court to review the appellate court's application of the *Moorman* doctrine to this case. Slip op. at 5. The *Moorman* issue impacts on the jurisdictional question, as is aptly demonstrated in the court's opinion. See slip op. at 12. Indeed, the confused nature of the court's treatment of count I is attributable to the court's unjustified decision to hold the *Moorman* issue forfeited. By so doing, the court is, in actuality, refusing to address whether count I actually states a valid cause of action for negligence. It must be pointed out that the circuit court ruled that count I did not state a cause of action because under *Moorman*, the economic damages being sought under the negligence theory were barred. The appellate court reversed, holding that an exception to the doctrine was satisfied, and reinstated the count. In so doing, the appellate court correctly recognized that *Moorman* is properly asserted under section 2–615 of the Code of Civil Procedure and not, as an affirmative defense, under section 2–619(a)(9). 375 Ill. App. 3d at 448. I note in passing that the court today is satisfied to simply "accept the appellate court's characterization of the procedural posture of the case" because the parties have not bothered to make it an issue here. Slip op. at 3. Regardless of whether the parties make it an issue, I would submit that proper procedure is not a matter of for a court's acquiescence. Since the mislabeling of a motion is generally not cause for reversal absent prejudice (*Scott Wetzel Services v. Regard*, 271 Ill. App. 3d 478, 481 (1995)), there is simply no reason why the court could not have clarified the propriety of the motion practice below.

because neither the jurisdictional question nor the *Moorman* question can be fully resolved without first identifying the nature of count I. Nevertheless, the court insists on answering the jurisdictional question without first addressing the viability of count I in general. In so doing, the opinion seemingly endorses a negligence theory of recovery by recognizing a professional standard of care with respect to veterinarians. Slip op. at 12. I do not believe that a general negligence claim is the appropriate remedy to compensate animal owners such as plaintiffs. Rather, given the relationship between the animal owner and the veterinarian and the classification of animals as personal property, the proper theory of recovery is a contractual claim based on bailment. Therefore, although the circuit court correctly recognized that count I was subject to dismissal, I would allow plaintiffs the opportunity replead count I as a contract claim, specifically a breach of bailment.

A bailment constitutes the delivery of personal property "for the accomplishment of some purpose, upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it." *Smalich v. Westfall*, 440 Pa. 409, 413, 269 A.2d 476, 480 (1970); see also 8A Am. Jur. 2d *Bailments* §1 (1997). A bailment is a "contractual arrangement" and, as such, is governed by the same rules of law that govern contracts in general. 8A Am. Jur. 2d *Bailments* §29 (1997). A bailment contract may be oral or written. 19 Williston on Contracts §53:1, at 10 (2001). Generally, three categories of bailments exist. Bailments can be made for the sole benefit of the bailor, for the sole benefit of the bailee, or for the mutual benefit of both. 8A Am. Jur. 2d *Bailments* §1 (1997).

One form of mutual benefit bailment is the "hire of labor and services." J. Story, Commentaries on the Law of Bailments with Illustrations from the Civil and Foreign Law §421, at 381 (9th ed. 1878) (hereinafter, Commentaries on the Law of Bailments). Those undertaking the performance of services under a bailment agreement are obliged to "do the work; to do it at the time agreed on; to do it well; to employ the materials furnished by the employer in a proper manner; and lastly, to exercise the proper degree of care and diligence about the work." Commentaries on the Law of Bailments §428, at 389. The bailee's duties arise from the nature of the parties' agreement, but the "law fixes the standard of care that the bailee must

exercise in the performance of the functions the bailee has undertaken." 19 Williston on Contracts §53:5, at 21-22 (2001). With respect to bailments for mutual benefit, generally, the bailee will be liable for losses that are proximately the result of the bailee's own negligence. 19 Williston on Contracts §53:5, at 22 (2001). Although standards of care included in a bailment contract "more nearly approximate the law of torts than that of contracts, the rights and obligations of the parties under a contract of bailment may include, by implication, rights and duties imposed upon the bailee by law." 19 Williston on Contracts §53:5, at 23-24 (2001). See also *St. Paul-Mercury Indemnity Co. v. City of Hughes*, 231 Ark. 530, 331 S.W.2d 106 (1960) (holding that action can be maintained against municipality despite tort immunity of the bailee municipality). "Where skill, as well as care, is required in performing the undertaking, there, if the party purports to have skill in the business, and he undertakes for hire, he is bound, not only to ordinary care and diligence in securing and preserving the thing, but also to the exercise of due and ordinary skill in the employment of his art or business about it." Commentaries on the Law of Bailments §431, at 392. Under the law of bailments, damages will lie against the party undertaking the work if "he applies less [skill] than the occasion requires." Commentaries on the Law of Bailments §431, at 393. This is so because "where a person is employed in a work of skill, the employer *buys both his labor and his judgment*." (Emphasis added.) Commentaries on the Law of Bailments §431, at 393.

Illinois jurisprudence has long recognized the operation of these principles. This court has held that, in order to establish a bailor-bailee relationship, "there must be either an express agreement *** or an agreement by implication, which may be gathered from the circumstances surrounding the transaction, such as the benefits to be received by the parties, their intentions, the kind of property involved, and the opportunities of each to exercise control over the property." *Wall v. Airport Parking Co. of Chicago*, 41 Ill. 2d 506, 509 (1969). Under the bailment, the bailee has a duty to exercise the skill or knowledge pertaining to the "nature of the business." *Mayer v. Brensinger*, 180 Ill. 110, 113-14 (1899) (recognizing in breach of contract action on a bailment that "[t]he obligation to discharge such duty is implied from the relation between the parties"); see also

*Saddler v. National Bank of Bloomington*, 403 Ill. 218, 229 (1949) (stating same principle); *Schaefer v. Washington Safety Deposit Co.*, 281 Ill. 43, 48 (1917) (same). Bailees will be liable for losses that result from their negligence or, more precisely, for their failure to exercise the skill or knowledge pertaining to the nature of their businesses. *Saddler*, 403 Ill. at 229.

In light of these principles, when an animal or pet is left with a veterinarian for care, it is part and parcel of the contract itself that the veterinarian will exercise his or her specialized medical skill and judgment in treating the animal. Such a rule recognizes the notion that a bailor does not just hire the bailee for his labor, but for his judgment as well. Commentaries on the Law of Bailments §431, at 393. In other words, the bailor expects, as part of the bargain, that the bailee will use the requisite skill and judgment pertaining to the nature of the business.

Accordingly, I see the relationship between an animal owner and a veterinarian, such as that described in count I, as a bailment relationship. Indeed, plaintiffs in count I alleged that they "entrusted" their horse to defendant for care and treatment. They "consented" to defendant's performing a specific surgery on the left carpel bone of their horse and "consented" specifically to defendant's draining fluid from the horse's right stifle. Plaintiffs specifically "instructed" defendant "not to perform surgery" on the right stifle because such surgery "is very risky." According to the complaint, defendant "*in violation of [plaintiffs'] express instructions*" (emphasis added) performed surgery on the horse's right stifle, which "ruined" the animal for "future use in racing. Plaintiffs alleged that defendant owed them a duty to exercise "reasonable care" in his "care and treatment" of the horse and to "render" such care and treatment "in compliance with the standards of a qualified veterinarian." According to plaintiffs, defendant failed to do so when he (i) failed "to adhere to the specific instructions" of plaintiffs "as to the scope of the surgery to be performed on the horse by performing surgery on the right stifle"; (ii) performed a surgery on the horse that "was unnecessary" and (iii) performed a surgery on the horse that "was in violation of the standard of care of a veterinarian." According to the complaint, defendant's negligence was the proximate cause of the damages plaintiffs suffered in that the surgery on the horse's right stifle "ruined

the horse for future use in racing." Plaintiffs alleged damage to their personal property "in the amount of the difference between the [fair market value] of the property immediately before the occurrence and its [fair market value] immediately after the occurrence."

The thrust of these allegations is that defendant performed a surgery on the horse that was specifically forbade by the property owner at the time of the property's delivery. The allegations also make clear that defendant purportedly did not exercise the skill or knowledge that plaintiffs expected as part of their bargain. In my view, these types of allegations present a classic breach-of-bailment situation. Indeed, bailments for mutual benefit have long been recognized as being particularly amenable to situations involving animal care. See Commentaries on the Law of Bailments §431, at 393 (acknowledging that "if a farrier undertakes the cure of a diseased or lame horse, he is bound to apply a reasonable exercise of skill to the cure; and if through his ignorance or bad management, the horse dies, he will be liable for the loss").

Recognizing plaintiffs' allegations as contractual in nature eliminates the problems inherent in attempting to recover under a negligence theory. Indeed, plaintiffs, in their brief, acknowledge that no Illinois court has expressly held that a cause of action exists for veterinary malpractice. This scarcity of case law owes not to any lack of sympathy for animal owners but, rather, to the legal realities that exist with respect to the relationship between the parties. As an initial matter, the victim of veterinary malpractice is incapable of bringing a cause of action against the veterinarian. *Oberschlake v. Veterinary Associates Animal Hospital*, 151 Ohio App. 3d 741, 745, 785 N.E.2d 811, 814 (2003); *Price v. Brown*, 545 Pa. 216, 228, 680 A.2d 1149, 1155 (1996) (Castile, J., dissenting). Under Illinois law, animals are recognized as personal property. See *Jankoski v. Preiser Animal Hospital, Ltd.*, 157 Ill. App. 3d 818 (1987). As personal property, an animal cannot bring suit against a veterinarian. Rather, the owner must institute the suit, and the owner is legally not the direct victim of the malpractice.[2] Additionally, the classification of animals as personal

---

[2]This of course also distinguishes veterinarian malpractice from other types of professional malpractice, such as attorney malpractice and

property limits the amount of damages that are available. Animals have long been designated as personal property under the common law. See G. Eichinger, *Veterinary Medicine: External Pressures on an Insular Profession and How Those Pressures Threaten to Change Current Malpractice Jurisprudence*, 67 Mont. L. Rev. 231, 242 (Summer 2006) (tracing classification of animals). Because of this classification, damages resulting from the negligence are limited to the animal's fair market value, or "economic damages," which generally means the difference in the fair market value of the animal before and after injury. 67 Mont. L. Rev. at 242. Thus, there is little if any financial incentive to sue for injuries and the types of damages available are often inadequate to address the injury to the animal or its owner. W. Root, *"Man's Best Friend": Property or Family Member? An Examination of the Legal Classification of Companion Animals and Its Impact on Damages Recoverable for Their Wrongful Death or Injury*, 47 Vill. L. Rev. 423, 442 (2002).

Having properly framed the relationship of the parties as one of bailment and the complained of conduct as a breach of the bailment, the questions that are presented in this appeal can be addressed in the proper context. Given the above, especially the differences between the doctor-patient relationship and the veterinarian-animal owner relationship, it would appear that economic damages for damage to or loss of personal property arising from malpractice would be barred by the *Moorman* doctrine. See *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146 (1986) (holding that *Moorman* doctrine applies to service contracts).[3] Under a bailment theory of

accountant malpractice.

[3]It is critical to distinguish this case, which involves a bailment and the attendant duties arising directly from the bailment relationship, from the line of cases which recognize duties arising outside of contract relationships–sometimes referred to as being duties *ex contractu* See *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 163 (1994) (discussing cases). The latter cases do not involve bailments and, as such, their analyses are inapplicable to cases like this one.

recovery, the *Moorman* doctrine would have no application since the economic damages being sought are recoverable in contract.

That leaves only the jurisdictional question. Before turning to it, some additional procedural details that have been ignored in today's opinion need addressing. The complaint we address today is plaintiffs' second amended complaint. When plaintiffs filed their original complaint, defendant moved for dismissal on the basis that jurisdiction rested in the Court of Claims and not in the circuit court. The circuit court rejected the argument, ruling that defendant was a licensed veterinarian. Defendant thereafter sought reconsideration in the trial court, and when that proved unsuccessful, he sought an interlocutory appeal under Rule 308(c). The appellate court declined to hear the case under Rule 308, and the case then proceeded in the circuit court. When the circuit court ultimately dismissed the complaint at issue here, plaintiffs appealed. Defendant, as the appellee, then renewed his jurisdictional argument by moving to dismiss the appeal in the appellate court Defendant argued that the Court of Claims was the appropriate tribunal for the litigation based on the fact that defendant was acting in the course of his employment as a professor at the University of Illinois College of Veterinary Medicine. Attached to the motion were four affidavits, two from defendant, one from the associate counsel of the University's Office of Legal Counsel, and another from the head of the Department of Veterinary Clinical Medicine at the University.

Defendant, in his affidavit, stated that he had been employed at the College of Veterinary Medicine at the University of Illinois since 1994, when he was first hired as an assistant professor "to teach, instruct, and train students, as well as to do research and educate students through clinical service, all at the College of Veterinary Medicine." At the time of his treatment of plaintiffs' horse in 2001, defendant was an associate professor. Defendant did not engage in the private practice of veterinary medicine while employed at the University, and, at no time, did he hold "himself out to the public as an equine surgeon or privately practicing veterinarian." In fact, defendant had not been in private practice since 1973. Defendant further stated that he "does not hold a license to practice veterinary medicine with the State of Illinois and has not held any such license" due to his being exempt, as a professor of veterinary medicine at the

University, from Illinois licensing laws. Since 1994, defendant taught, instructed, and trained veterinarian students "for purposes of examination and treatment of horses brought to the Large Animal Clinic at the University of Illinois." Defendant stated that it was "while he was employed as an instructor teaching veterinarian students at the University" and while he "was in performance of his duties of employment while officially employed with the University" that he "treated and examined the horse brought by the plaintiffs to the University."

Professor Warwick A. Arden, department head of Veterinary Clinical Medicine at the University, stated in his affidavit that since April 1994, defendant "had been employed as an instructor, faculty member and Professor" at the University. Defendant's duties throughout the time of his employment included "teaching veterinary students and examining and treating horses brought to the University of Illinois Large Animal Clinic." While in the course of his performance of official duties as an instructor and faculty member, defendant "was exempt" from the need for a veterinarian license.

Associate university counsel of the Office of Legal Counsel Mark D. Henss stated in his affidavit that the University, through its University Office of Risk Management currently had in place a self-insurance program under which defendant "is entitled to protection, provided he is employed by the University and acting within the scope of his University duties.

Plaintiffs, in their objection to the motion to dismiss, did not dispute the facts as set forth in the affidavits. Rather, they asserted that defendant could not seek to "turn" a regulatory and licensing statute into an immunity act.

Section 8(b) of the Court of Claims Act states that the Court of Claims shall have exclusive jurisdiction to hear "[a]ll claims against the State founded upon any contract entered into with the State of Illinois." 705 ILCS 505/8(b) (West 2004). Whether a claim is one "against the State" does not depend upon the state being named as a party. *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990). Rather, the determination depends the issues involved and the relief sought. *Healy*, 133 Ill. 2d at 308. The prohibition " 'against making the State of Illinois a party to a suit cannot be evaded by making an action nominally one against the servants or agents of the State when the real

claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested.' " *Healy*, 133 Ill. 2d at 308, quoting *Sass v. Kramer*, 72 Ill. 2d 485, 491 (1978). Sovereign immunity is not implicated, however, by allegations that the state's agent acted in violation of statutory or constitutional law or in excess of his authority, and, in those instances, the action can be heard in the circuit court. *Healy*, 133 Ill. 2d at 308.

An action that is brought nominally against a state employee in his individual capacity, but "could operate to control the actions of the State or subject it to liability," is considered an action against the State. *Currie v. Lao*, 148 Ill. 2d 151, 158 (1992). Thus, an individual defendant will be protected by sovereign immunity only if the suit against the individual is truly against the state. See Currie, 148 Ill. 2d at 158-59. This court has held that an action against a state employee is considered one against the state when (1) there are no allegations that an employee or agent of the state acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed by the employee independently of his state employment; and (3) the complained-of actions involve matters ordinarily within that employee's normal and official functions. *Jinkins v. Lee*, 209 Ill. 2d 320, 330 (2004).

The court holds today that the source of the duty involved here arose independent from the duties of the state employment. Slip op. at 12. Not even one paragraph later, however, the court clouds this holding by acknowledging that the *Moorman* doctrine has an impact on the question because, in the "typical" case, a veterinarian "will be providing care to an animal after having formed a contractual relationship with the owner of the animal." Slip op. at 12. What does this mean? I do not understand what exactly is being held because, on the one hand, it appears that the court is recognizing that the duty that is independent of state employment arises from notions of common law relating to professional standards of care. On the other hand, it also seems to concede that this independent duty is a contractual one. How the contractual duty squares with the state employment issue is, apparently, a question left for another day. I remind my colleagues that, because we are the highest court in the state, the legal community relies on our opinions "to map the evolving course of the law." *People v. Jung*, 192 Ill. 2d 1, 17 (2000) (McMorrow, J.,

-29-

specially concurring, joined by Miller and Freeman, JJ.). The court's analysis with respect to the jurisdictional question certainly raises more questions than answers.

Not surprisingly, I believe the jurisdictional question should be approached differently in light of the bailment relationship that existed between the parties and the University of Illinois. I have already demonstrated that the duties assumed by defendant in this case arose from a bailment relationship that existed between him and the plaintiffs–this much was clear from the limited facts surrounding the horse's treatment contained in the complaint.[4] However, the affidavits attached to the motion to dismiss make clear the bailment relationship between plaintiffs and defendant "would not have had a source outside the employment status of the defendant[ ]." *Healy*, 133 Ill. 2d at 313. Whatever duties arose from the relationship existed because of status of the defendant as a professor at the University of Illinois' College of Veterinary Medicine. Defendant could only accept the bailment and the duties imposed by it solely because of his state employment. Without that employment, defendant was not authorized to practice veterinary medicine in Illinois and would not have been able to legally perform the surgery at a veterinarian hospital. See 225 ILCS 115/5 (West 2004) (Prohibiting the "practice [of] veterinary medicine and surgery in any of its branches without a valid license to do so"). Defendant was, at the time of the bailment and the surgery, a professor at the College of Veterinary Medicine of the University of Illinois. His duties as a professor consisted of performing research and *training students by operating on animals* in the College's large-animal clinic. Defendant was not licensed at the time to practice veterinary surgery in Illinois. He was not in private practice and did not possess a veterinary license because, as a professor at a state university, he was exempt from Illinois' licensing requirements. Defendant did not carry malpractice insurance and has not been in

---

[4]Indeed, the complaint speaks consistently in terms such as "consent" and "instructions" yet the complaint does not refer to a consent form or written instructions. No such printed documents are attached as exhibits. Given the allegations, it is clear that some consultation had to occur at the university clinic before the equine procedures described in the complaint could have been scheduled. Clearly, this was not a "walk-in" procedure.

private practice since 1973.[5] Defendant therefore was acting in his normal and official role as a professor of at the College of Veterinary Medicine when he accepted the bailment and performed the surgery.

I note that, in 2000, there was "nearly one pet for every two Americans" and that, in 2001, "approximately 124 million dogs and cats live in American households." 47 Vill. L. Rev. at 423. In a society that increasingly values animals and household pets, the issues in this case deserve more than the short shrift given to them by a majority of the court. Everything about today's opinion, from its acknowledgment that the appellate court's *Moorman* analysis is "awkward at best" (slip op. at 5) to its nonchalant recognition of a professional standard of care suggests that my colleagues have failed to understand the ramifications its opinion will have the development of the law in this area. For this reason, I cannot join in the opinion and respectfully dissent.

JUSTICE BURKE joined in this dissent.

JUSTICE KILBRIDE also dissents, without opinion.

---

[5]Given the lack of a license, it is not surprising that the University provided for indemnification for any liability arising from defendant's employment. Although I express no opinion on how the indemnity issue impacts on the jurisdictional question, I must point out that the issue is not nearly as cut and dry as the court makes it out to be. Slip op. at 13-14. While acknowledging decisions such as *Janes v. Albergo*, 254 Ill. App. 3d 951 (1993), and *Kiersch v. Ogena*, 230 Ill. App. 3d 57 (1992) (slip op. at 13), the court ignores *Oppe v. State of Missouri*, 171 Ill. App. 3d 491 (1988), a decision which takes a decidedly different view on the effect of indemnity upon the doctrine of sovereign immunity. *Oppe* was cited with approval in *Currie*. See *Currie*, 148 Ill. 2d at 167.