FIRST DIVISION

No. 1-06-1859

| | | |
|---|---|---|
| LASALLE BANK, N.A., as Successor of | ) | Appeal from the |
| The Chicago Trust Company, as | ) | Circuit Court of |
| Plenary Guardian of the Estate of | ) | Cook County. |
| David Mount, a Disabled Person, and | ) | |
| GEORGIANNE CALANDRIELLO, as | ) | |
| Legal Guardian of David Mount, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | Nos. 01 L 1548 |
| | ) | |
| C/HCA DEVELOPMENT | ) | |
| CORPORATION, d/b/a Columbia | ) | |
| Olympia Fields Osteopathic | ) | |
| Hospital and Medical Center, | ) | |
| LEE FREUND,  THOMAS PAWLOWSKI, | ) | |
| MICHAEL SETTECASE,  and MIDWEST | ) | |
| PHYSICIAN GROUP, LTD., | ) | Honorable |
| | ) | Daniel M. Locallo, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiffs claim that defendant doctors committed medical negligence leading to the disability of David Mount.  After a trial, the jury found for defendants.  The trial court rejected plaintiffs' six claims,  made in their posttrial motion and reiterated on this appeal, arguing for reversal.  For the reasons stated below, we affirm.

No. 1-06-1859

BACKGROUND

The parties to this action are as follows.  Plaintiff Georgianne Calandriello was the fianceè of David Mount and is now Mount's legal guardian.  Mount suffered cardiac arrest on March 2, 1999, resulting in brain damage and other injuries for which plaintiffs sought damages in this lawsuit.  Plaintiff LaSalle Bank is the successor to the Chicago Trust Company, which was the plenary guardian of Mount's estate.

Defendant Midwest Physicians Group (Midwest) operated a medical clinic where Mount was treated in February and March 1999, shortly before his cardiac arrest.  The Midwest clinic was located inside defendant Columbia Olympia Fields Osteopathic Hospital and Medical Center,  operated by the C/HCA Development Corporation (Olympia Fields).  Defendants Dr. Lee Freund and Dr. Thomas Pawlowski were second-year family-practice residents who treated Mount at the Midwest clinic.  Defendant Dr. Michael Settecase was the supervising doctor who signed a referral for Mount to be examined by a cardiologist.  Drs. Freund, Pawlowski and Settecase are all osteopathic doctors.  The trial court instructed the jurors that if they found Dr. Freund or Dr. Pawlowski to have been negligent then defendant Olympia Fields would also be liable, and that if they found Dr. Settecase to have been negligent then defendant Midwest would also be liable.

The following facts are not in dispute:  David Mount had a stress test performed at the Ingalls Wellness Center on February 6, 1999.  He was treated at the Midwest clinic on February 8, February 18 and March 1, 1999.  During the February 8 visit, Mount was examined by Dr.

Freund; and during the last two visits, Mount was examined by Dr. Pawlowski. On February 18, Dr. Pawlowski made a request for a referral for Mount to see a cardiologist, and this request was signed and approved by Dr. Settecase, a supervising doctor. An appointment was scheduled for Mount to see a cardiologist on March 5, 1999. Unfortunately, Mount suffered a cardiac arrest on March 2, before the appointment took place.

The evidence at trial included the following testimony. Plaintiff Calandriello testified at trial that Mount went with her on February 6, 1999, and both had stress tests at the Ingalls Wellness Center (Ingalls) and cardiac CT scans at a location in Calumet City. These tests had not been ordered by Mount's physician or any other physician.

Laura Stancik, an exercise physiologist at Ingalls who performed Mount's stress test, testified at trial that Mount was 51, 5 feet 8 inches tall and weighed 228 pounds. Stancik testified that during a stress test, the patient is on a treadmill or stationary bicycle, the patient's heart rate and blood pressure are monitored, and an EKG is performed. Stancik testified that, as an exercise physiologist, she has been taught to recognize premature ventricular contractions, or PVCs, from the rhythm strips generated by the stress test. Stancik explained: "A PVC is basically something that is irritating the ventricles [of the heart] and it's causing to override the normal pacemaker of the heart." Stancik further explained: "A couplet is basically two PVCs that occur in a row. So you have one and then another one happens right after it." A triplet is three in a row. Stancik also explained that a multifocal PVC "com[es] from different parts of the ventricles."

Stancik further testified that during Mount's stress test, Mount's heart displayed abnormal rhythms and his blood pressure rose; and as a result, she stopped the test. Stancik testified that Mount's test recorded couplets, triplets and multifocals. Stancik testified that she "told [Mount] that he should see his doctor as soon as possible" and that she gave him a copy of the rhythm strips generated by the stress test. Dr. Hamid, who was not a witness at trial, was the cardiologist who subsequently reviewed the strips on behalf of Ingalls. Ingalls, Stancik and Dr. Hamid were not defendants to this action..

Defendant Dr. Freund testified that on February 8, 1999, Mount went to defendant Midwest and was examined by Dr. Freund. Dr. Freund testified that he did not become board certified in family practice until 2000, when he completed his residency; and that in 1999, when he saw Mount, he was a second-year resident and had a temporary doctor's license as a resident or intern. There was a factual dispute at trial about whether Mount had brought the rhythm strips with him on the February 8 visit to Midwest. Dr. Freund testified that, of the three tests performed on February 6, Mount brought with him the written results of the cardiac CT scan but not the written results of either the stress test or the EKG.

Dr. Freund testified that Mount's chief complaint, as recorded in the progress notes, was "elsewhere did bike treadmill last Saturday," and "showed PVCs", and "a cardiac CT of 12.2 out of 400." Dr. Freund testified that Mount told him the results of the stress test which included "asympotomatic PVCs, runs of two." Dr. Freund testified that his assessment was that Mount had hypertension, and he instructed Mount to return to the clinic in three to six months to recheck

4

Mount's blood pressure.

Dr. Freund testified that one of the supervising doctors or preceptors in February and March 1999 was defendant Dr. Settecase. Dr. Freund testified that on February 8, while Mount was still present in the Midwest clinic, Dr. Freund discussed Mount's case with Dr. Settecase. Dr. Freund informed Dr. Settecase that at this "early stage" of Dr. Freund's training, the CT scan was "a new test [that he] was unfamiliar with." Dr. Freund testified that after discussing the CT test results with Dr. Settecase, Dr. Freund formed the opinion that Mount's CT test results were very good. Dr. Freund also testified that at this point in his training he would not have been able to interpret stress test results, but he did not recall whether he discussed the stress test results with Dr. Settecase. However, Dr. Freund testified that Dr. Settecase would have had an opportunity to review the chart. Dr. Freund did not recall either contacting Ingalls or asking Mount to obtain a copy of the stress test results.

Defendant Dr. Pawlowski testified, that when Mount returned to Midwest on February 18 and March 1, 1999, he was examined on both occasions by Dr. Pawlowski, who, like Dr. Freund, was a second-year resident. Dr. Pawlowski testified that he had the authority to order X-rays and medication, but referrals to a specialist had to go through a "preceptor," or supervising doctor. Dr. Pawlowski recalled that on February 18, Mount was accompanied by someone whom Dr. Pawlowski later learned was Mount's son, Kyle Mount. Dr. Pawlowski testified that a telephone message prior to the Thursday, February 18 visit indicated that Mount's chief complaint was that he had been sick since Sunday. Dr. Pawlowski testified that the chart from

February 18, completed by the nurse prior to the doctor's examination, indicated that Mount had a fever of 99 with flu symptoms, such as nasal drainage and increased yellow phlegm, and that Mount was complaining of fatigue.

Dr. Pawlowski testified that on February 18, Mount did not have with him the results of the EKG, the stress test or the CT scan. At trial, Dr. Pawlowski identified a drawing at the top of Mount's chart of multi focal PVCs as a drawing in Dr. Pawlowski's handwriting. Dr. Pawlowski testified that he "must have" received information concerning multifocal PVCs from Mount, because he did not have the written stress test results, and that he made the drawing in order to explain multifocal PVCs to Mount and his son. Unlike Dr. Freund, Dr. Pawlowski testified that if he had seen the rhythm strips from the stress test, he would have been qualified to read them. With respect to his experience with congestive heart failure, he testified: "[H]eart failure, it's bread and butter for family practice and internal medicine. That's what we see a lot of." Dr. Pawlowski testified that in 1999, he also "moonlight[ed]" in hospital emergency rooms where he handled complex cases of heart failure.

Dr. Pawlowski testified that on February 18, he listened to all parts of Mount's lung with a stethoscope; and on the left side, he heard some harsh noises that are called rales. Dr. Pawlowski explained that with congestive heart failure, one would hear "crackles on either side, which is a different finding altogether" and the cough "would probably be more of a non-productive cough." Dr. Pawlowski testified that "there's a huge difference between crackles, which is more with heart failure, and the rales which is with pneumonia." Dr. Pawlowski

6

testified he also listened to Mount's heart and did not hear any PVCs.   Dr. Pawlowski testified

that Mount had a normal heart rate and rhythm which is also not consistent with congestive heart

failure. Dr. Pawlowski testified that even PVCs can be "very benign in very many people," and

that PVCs in an otherwise healthy individual with a history of hypertension, like Mount had,  was

not "atypical."   Dr. Pawlowski testified that on February 18, he assessed David Mount as having

pneumonia,  prescribed antibiotics and a decongestant, and directed Mount to return in 10 days.

Dr. Pawlowski testified that he viewed Mount's rhythm strips during the litigation and

concluded:  "Had I seen those strips [on February 18], I would have treated him for pneumonia,

which I did."

Dr. Pawlowski agreed that distinguishing between pneumonia and cardiomyopathy

required an echocardiogram, which, in turn, required a referral to a cardiologist.  Dr. Pawlowski

testified that on February 18, he completed the paperwork to request a cardiologist referral for

Mount.  Dr. Pawlowski explained that his request would then be sent to Dr. Settecase or another

supervisor, who had the authority to approve the request.  Dr. Pawlowski testified that Dr.

Settecase did, in fact, approve the request in Mount's case.  Dr. Pawlowski did not recall whether

he told Mount on February 18 to make an appointment with a cardiologist.  Dr. Pawlowski

testified that he requested the cardiologist referral because Mount insisted on it, not because he

thought there was a medical reason for it.

Dr. Pawlowski testified that he examined Mount again on March 1, 1999, for a follow-up

for pneumonia.  Dr. Pawlowski testified that Mount reported chest tightness, a productive cough

7

and nasal discharge but Mount also indicated that he was feeling better. Dr. Pawlowski testified that on March 1, Mount's heart was at a regular rate, and was showing no PVCs, no type of arrhythmias and no signs of distress; and he listened to Mount's lungs and the harsh rales were gone. Dr. Pawlowski's assessment was that the pneumonia was resolving. Dr. Pawlowski testified that when he treats a patient for pneumonia and he observes the patient "clinically get better," the improvement "reaffirms" that "pneumonia was the correct diagnosis." Dr. Pawlowski added: "Heart failure does not get better for no reason." Dr. Pawlowski testified that he also did not have the rhythm strips during the March 1 visit. Dr. Pawlowski testified that the preceptor or supervising doctor on March 1 was not Dr. Settecase but Dr. John Hohner.

Dr. Settecase, the supervising doctor who signed a cardiologist referral for Mount, testified that in 1999, he was employed by defendant Midwest Physicians Group, and his specialty was family practice. Dr. Settecase testified that Mount had been treated for hypertension for a long period of time prior to 1999, and that he did not recall a conversation between himself and Dr. Freund on February 8, 1999, regarding Mount's stress test. Dr. Settecase opined that if, on February 8, 1999, a family practice doctor had reviewed the February 6 rhythm strips and accompanying face sheet, the standard of care did not require an immediate referral to a cardiologist. Dr. Settecase also identified his signature on Mount's chart indicating that he had reviewed Dr. Freund's February 8 note. However, when Dr. Pawlowski recommended a cardiologist referral, Dr. Settecase believed that it was reasonable and authorized it.

In addition to the above fact witnesses, the jury heard from six medical experts in family practice and cardiology. Plaintiffs called: Dr. Finley Brown, a family practice physician; and Dr. James Talano, a cardiologist who testified by a videotaped evidence deposition. Defendants called: Drs. Steven Eisenstein and Harold Sarran, family practice physicians; and Drs. Thomas Mayer and Joseph Messer, cardiologists.

With respect to the issue of damages, plaintiffs called: Dr. Gary Yarkony, an expert in rehabilitation medicine retained by plaintiffs to devise a "life care plan" for Mount after his cardiac arrest; and Larry DeBrock, an economics professor. In addition, the jury heard testimony from: Kyle Mount, Mount's son; and Lawrence Suss and Brain Davis, friends of Mount, who testified about Mount's life before and after the cardiac arrest.

After hearing all the evidence, the jury returned a verdict in favor of the defendants. Plaintiffs filed a posttrial motion that the trial court denied. This appeal followed.

ANALYSIS

On appeal, plaintiff makes six claims: (1) the trial court erred by refusing to use the current Illinois Pattern Jury Instruction for professional negligence; (2) the trial court abused its discretion when it admitted certain discovery deposition testimony of defendant Dr. Settecase for impeachment purposes only, and refused to admit it as substantive evidence; (3) the trial court abused its discretion by refusing to allow evidence that defendant Dr. Settecase allegedly had a financial incentive to withhold a referral to a cardiologist; (4) the trial court abused its discretion by refusing to admit evidence that Mount belonged to a health maintenance organization (HMO);

(5) the trial court refused, in the issues instruction, to instruct the jury to consider plaintiffs' claim that defendant Dr. Settecase was negligent in failing to obtain the rhythm strips from Mount's stress test, if Dr. Settecase did not already have them; and (6) the jury verdict was against the manifest weight of the evidence. For the reasons discussed below, we affirm. Each claim is discussed below.

### 1. Jury Instruction Defining Professional Negligence

Plaintiffs' first claim on appeal is that the trial court erred by refusing to use the current pattern jury instruction in defining professional negligence.

Supreme Court Rule 239(a) states that a trial court "shall" use the current Illinois Pattern Jury Instruction (IPI) when it is "applicable in a civil case, giving due consideration to the facts and the prevailing law *** unless the court determines that it does not accurately state the law." 177 Ill. 2d R. 239(a), (discussed with approval in York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 204 (2006)). The use of the word "shall" in the rule makes clear that use of the current IPI is not optional, but mandatory. Ultsch v. Illinois Municipal Retirement Fund, 226 Ill. 2d 169, 179 (2007) (the use of the word "shall" indicates a mandatory requirement). The rule permits the trial court to use a different instruction, only if the applicable instruction does not accurately state the law. Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273 (2002). Thus, if both a prior and a current version of a pattern instruction accurately state the law, Supreme Court Rule 239(a) requires the trial court to use the current version. 177 Ill. 2d R. 239 (a).

On appeal, a reviewing court will reverse a trial court's determination about which instruction to give, only if the trial court abused its discretion. Schultz, 201 Ill. 2d at 273. A trial court has discretion in determining which instructions to give. Schultz, 201 Ill. 2d at 273. When deciding whether a trial court abused its discretion, a reviewing court will examine the jury instructions in their entirety, to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. Schultz, 201 Ill. 2d at 273-74.

Ordinarily, a reviewing court will not reverse a trial court, even if the trial court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the appellant. Schultz, 201 Ill. 2d at 274. Thus, if a trial court uses an older version of an IPI, that action may violate Supreme Court Rule 239 and thus constitute error, but it might not rise to the level of reversible error, if the older version was still an accurate, although differently worded, statement of the law. Smith v. Marvin, 377 Ill. App. 3d 562, 567-68 (2007) (since instruction was an accurate statement of the law, defendants cannot establish prejudice requiring a new trial).

In the case at bar, plaintiffs claim that the trial court erred by failing to use the 2006 version of IPI Civil No. 105.01 in its entirety. Specifically, plaintiffs claim that the trial court erred by replacing the phrase "reasonably careful" in the 2006 version, with the phrase "reasonably well-qualified" from the 2005 version.

The version of IPI Civil No. 105.01 that appears in the 2006 edition of the Illinois Pattern Jury Instructions is both the current version and the version that was current at the time of the trial in the case at bar. The 2006 version is entitled "Professional Negligence –Duty" and applies

to all professionals, including doctors.  It states, in full:

> " 'Professional negligence' by a _____ is the failure to
> do something that a reasonably careful _____ [practicing in the
> same or similar localities] would do, or the doing of something that
> a reasonably careful _____ would not do, under circumstances
> similar to those shown by the evidence.
>
> The phrase ['violation of the standard of care'] ['deviation
> from the standard of practice'] means the same thing as
> 'professional negligence.
>
> [To determine what the standard [of care] [of practice]
> required in this case, you must rely upon (opinion testimony from
> qualified witnesses) (evidence of professional standards) (evidence
> of by-laws/rules regulations/policies/procedures) (evidence of
> community practice) (and other sources).  You must not attempt to
> determine this question from any personal knowledge you have.]
> The law does not say how a reasonably careful _____ would act
> under these circumstances.  That is for you to decide."  IPI Civil
> (2006) No. 105.01.

Instead of giving the entire 2006 version of IPI Civil No. 105.01, the trial court gave a
hybrid of the 2005 and 2006 versions.  Specifically, the trial court rejected the "reasonably

careful" language from the 2006 version and replaced it with the "reasonably well-qualified"
language from the 2005 version. The 2005 version of IPI Civil No. 105.01 stated, in full:

"In providing professional services to _____, a

_____ must possess and apply the knowledge and use the

skill and care ordinarily used by a reasonably well-qualified

_____ [practicing in the same or similar localities] under

the circumstances similar to those shown by the evidence. A

failure to do so is professional negligence.

[The only way in which you may decide whether (a) (any)

defendant possessed and applied the knowledge and used the skill

and care which the law required of him is from (expert testimony)

(and) (or) (evidence of professional standards or conduct)

presented in the trial. You must not attempt to determine this

question from any personal knowledge you have.]" IPI Civil

(2005) No. 105.01.

The hybrid instruction given by the trial court stated:

"Professional negligence by a doctor is the failure

to do something that a reasonably well-qualified doctor would do

or the doing of something that a reasonably well-qualified doctor

would not do under the circumstances similar to those shown by

the evidence. The phrase 'deviation from the standard of care'

means the same thing as 'professional negligence.' To determine

the standard of care required in this case, you must rely upon

opinion testimony from qualified witnesses. You must not attempt

to determine this question from any personal knowledge you have.

The law does not say how a reasonably well-qualified doctor would

act under these circumstances. The only way you can decide this

question is to base your decision on the testimony from qualified

witnesses."

The trial court's instruction is almost, word for word, the same as the 2006 version, except in the three places where the 2006 version used the phrase "reasonably careful," the trial court replaced that phrase with the phrase "reasonably well-qualified" taken from the 2005 version.

This court's first task is to determine whether the phrase "reasonably careful" accurately states the law. The 2006 Committee took the phrase "reasonably careful" from IPI Civil (2006) No. 10.01, which is the instruction for ordinary negligence. The 2006 version of IPI Civil No. 105.01 is thus a hybrid itself. It combines lines from IPI Civil (2006) No. 10.01, the instruction for ordinary negligence, with lines from the 2005 version of IPI Civil No. 105.01, the instruction for professional negligence. In the 2006 version, paragraph 1 and the last 2 lines of paragraph 3 are based on the ordinary negligence instruction, while paragraph 2 and the rest of paragraph 3

are based on the 2005 version of the professional negligence instruction. [1]

The Comment to the 2006 version describes the change from "reasonably well-qualified" to "reasonably careful" as follows:

> "There is a subtle change in the content of the instruction; the former instruction defined standard of care in terms of a 'reasonably well-qualified' professional, while this current instruction uses the language 'reasonably careful.' This change was made to conform to cases such as Jones v. Chicago HMO Ltd.

---

[1] Ordinary negligence and professional negligence are two different causes of action, involving two different "standard[s] of care": "an ordinary, reasonable standard of care," as opposed to "a professional standard of care." Myers v. Heritage Enterprises, Inc., 354 Ill. App. 3d 241, 245-46 (2004). Prior to the 2006 edition of the IPI, the IPI used the phrase "a reasonably careful person" to denote the "ordinary, reasonable standard of care," and the phrase "a reasonably well-qualified" doctor (or other professional) to denote the "professional standard of care." Myers, 354 Ill. App. 3d at 245-46. A "crucial difference" between the two causes of action is that in professional negligence cases, expert testimony is "usually required" to establish the standard of care expected of that professional and jurors are instructed not to rely on their own personal knowledge for that purpose. Jones v. Chicago HMO, Ltd. of Illinois 191 Ill. 2d 278, 295-96 (2000); Advincula v. United Blood Services, 176 Ill. 2d 1, 24, 30 (1996); compare IPI Civil No. 105.01 with IPI Civil (2006) No. 10.01.

15

of Illinois, [191 Ill. 2d 278, 291 (2000)], Advincula v. United

Blood Services, [176 Ill. 2d 1, 28 (1996)], and Bryant v. LaGrange

Memorial Hosp., [345 Ill. App. 3d 565, 575 (2003)]." IPI Civil,

(2006) No. 150.01, comment at 279.

Defendants claim that the three cases cited above did not require a change from "reasonably well-qualified" to "reasonably careful." Whether the three cases required the change is not the issue. The issue is whether the phrase "reasonably careful" in the 2006 instruction was an accurate statement of the law. If it was, then Supreme Court Rule 239 mandated its use. 177 Ill. 2d R. 239(a). Although pattern instructions are not themselves law and are thus open to challenge if they are inaccurate statements of the law, the instructions are mandatory if accurate. Powers v. Illinois Central Gulf R.R. Co., 91 Ill. 2d 375, 385 (1982) (although mandated by supreme court rule, IPI are open to legal challenge until "considered" and upheld by our supreme court).

The recent supreme court case of Loman v. Freeman, 229 Ill. 2d 104 (2008), leaves no doubt that the phrase "reasonably careful" in the 2006 instruction was an accurate statement of the law. In Loman, our supreme court cited with approval its prior decision in Advincula, upon which the 2006 change was based. Loman, 229 Ill. 2d at 119. The Loman court quoted Advincula for the proposition that "the standard of care for all professionals is 'the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise

16

under similar circumstances.' " Loman, 2008 Ill.229 Ill. 2d at 119, quoting Advincula, 176 Ill.

2d at 23 (this is "the established standard of care for all professionals" in Illinois). The use of the

phrase "ordinarily careful professional" in Advincula and cases like it to describe the

professional standard of care shows that the similar phrase, "reasonably careful professional,"

was an accurate statement of the law. Advincula, 176 Ill. 2d at 23; Jones, 191 Ill. 2d at 295[2];

Bryant, 345 Ill. App. 3d at 575. The adverbs "reasonably" and "ordinarily" have been used

interchangeably by our supreme court when describing the professional standard of care.

Advincula, 176 Ill. 2d at 22-23.

Since the phrase "reasonably careful" was an accurate statement of the law, Supreme

Court Rule 239 required the trial court to use it, and the failure to give it was error. 177 Ill. 2d R.

239(a). However, plaintiffs suffered no prejudice from this error because the "reasonably well-

qualified" language used by the trial court was also an accurate statement of the law. Jinkins v.

---

[2]In Jones, our supreme court held: "[I]n a professional negligence case, the standard of

care required of a defendant is to act as would an 'ordinarily careful professional.' Advincula,

176 Ill. 2d at 23. Pursuant to this standard of care, professionals are expected to use the same

degree of knowledge, skill and ability as an ordinarily careful professional wold exercise under

similar circumstances. Advincula, 176 Ill. 2d at 23-24." Jones, 191 Ill. 2d at 295. In Bryant, this

court reiterated this statement of the law, also citing Advincula, 176 Ill. 2d at 23-24. Bryant, 345

Ill. App. 3d at 575.

Lee, 209 Ill. 2d 320, 336 (2004)[3]; Purtil v. Hess, 111 Ill. 2d 229, 242 (1986); Regala v. Rush North Shore Medical Center, 323 Ill. App. 3d 579, 586 (2001) (holding that IPI Civil (1990) No. 105.01 "properly states the law"). In Loman, the same opinion in which our supreme court quoted with approval the " 'ordinarily careful professional' " language from Advincula, our supreme court also quoted with approval the " 'reasonably well-qualified physician' " language from its Purtil decision . Loman, 229 Ill. 2d at 119, quoting Purtil, 111 Ill. 2d at 242, and Advincula, 176 Ill. 2d at 23.[4]

With respect to the lack of prejudice, the appellate court decision in Smith is directly on point. Smith, 377 Ill. App. 3d at 567-68. In Smith, the appellate court considered a similar hybrid instruction, that combined the 2005 and 2006 versions of IPI Civil No. 105.01 and also used "reasonably well-qualified" instead of "reasonably careful." Smith, 377 Ill. App. 3d at 566. The appellate court held that since the hybrid instruction was an accurate statement of the law, defendants could not establish prejudice requiring a new trial. Smith, 377 Ill. App. 3d at 567-68.

---

[3]In Jinkins, our supreme court stated: "A physician's duty is to exercise the same degree of knowledge, skill, and care which a reasonably well qualified physician in the same or similar community would use under similar circumstances." Jinkins, 209 Ill. 2d at 336, citing Purtill v. Hess, 111 Ill. 2d 229, 242 (1986).

[4]In a parenthetical in Advincula, our supreme court described the old version of IPI Civil No. 105.01, which had used the "reasonably well-qualified" language, as requiring professionals to act "as an ordinarily careful professional would." Advincula, 176 Ill. 2d at 23.

We cannot find that the trial court's insertion of "reasonably well-qualified" into the 2006 version of IP Civil No. 105.01 was an abuse of discretion because first, as discussed above, defendants suffered no prejudice from it, and second, the appellate court's prior decision in Smith may have created some confusion as to the propriety of using a hybrid instruction with the "reasonably well-qualified" phrase. Smith, 377 Ill. App. 3d at 567-68. To be clear, we read Smith only for the proposition that the trial court's hybrid instruction, while error, did not prejudice defendants, because it was still an accurate statement of the law. Smith, 377 Ill. App. 3d at 567-68.

The job of drafting pattern jury instructions was not given to the trial courts or the appellate courts. IPI Civil, (2006) at xxiv-xxv. Our supreme court gave that job to the Illinois Supreme Court Committee on Pattern Jury Instructions, and required its lower courts to use the pattern instructions, unless the committee failed to state the law "accurately." 177 Ill. 2d R. 239(a); IPI Civil, (2006) at xix (ed. 2006). Even if trial judges believe they could do a better job than the committee, they should still use the pattern instruction, unless it is not an accurate statement of the law. 177 Ill. 2d R. 239(a); Torres v. Irving Press, Inc., 303 Ill. App. 3d 151, 157-58 (1999) (rejecting a court's attempt to improve on the word "disability" in the pattern jury instruction by substituting the phrase "loss of normal life"). In the case before us, there is nothing in the record to indicate that the trial court flouted rules or precedent, and thereby abused its discretion. However, a trial court runs the risk of abusing its discretion if it repeatedly ignores Supreme Court Rule 239(a) by substantively altering an instruction that is already a correct

19

statement of the law.  177 Ill. 2d R. 239(a).

2.      Discovery Deposition Testimony Substantive Evidence

Plaintiffs' second claim on appeal is that the trial court abused its discretion when it admitted the discovery deposition testimony of defendant Dr. Settecase  for impeachment purposes only, and refused to admit it as substantive evidence.  After plaintiffs' counsel asked defendant Dr. Settecase if he had given certain answers at his deposition, the trial court gave the jury a limiting instruction stating that "the deposition testimony is not substantive evidence" and that the jurors should use it solely "for purposes of assessing the weight to be given to the testimony of the witness in the courtroom."

At trial, plaintiffs' counsel argued that there were "two critical statements" in defendant Dr. Settecase's deposition.   The first statement was:  "[l]ooking at this sheet,[5] the patient should have been referred to cardiology if these were in front of him [the doctor]."   The second statement was: "had I seen pages 2 and 3 [Mount's stress test rhythm strips], we would have arranged for him to see cardiology as quickly as possible, if not that day."

At trial, plaintiffs' counsel asked the trial court to admit the first statement for impeachment purposes. Plaintiffs' counsel argued "we have a right to impeach" with that statement.  Over vigorous objection and lengthy argument by defense attorneys, the trial court ruled that the first statement was admissible for impeachment purposes. After the trial court

---

[5]Although defense counsel argued otherwise, the trial court found it could be "logically inferred" that the reference to "this sheet" was a reference to the stress test rhythm strips.

announced "this will be my view," that the first statement is admissible "solely for assessing the weight to be given to the testimony of the witness in court," defense counsel stated, "I don't think that's right." However, plaintiffs' counsel made no objection. The trial court noted that it was making its ruling "over [defense counsel's] objection." Defense counsel stated to plaintiffs' counsel "you're winning" and plaintiffs' counsel replied "I know I am."

With respect to the second statement, plaintiffs' counsel stated "that is the admission" and asked the trial court to admit it as an admission Plaintiffs' counsel also requested admission of the second statement for impeachment purposes, stating:

> "I have a right to ask him [Dr. Settecase] a foundational question and he has a right to answer it.
>
> If he answers it consistent with his deposition, that's the end of it, end of the issue. If he doesn't, I have a right to impeach him ***."

With respect to the second statement, the trial court ruled that it could "go before the jury but solely as to the weight of [Dr. Settecase's] testimony in this courtroom and not for substantive purposes." Immediately after the trial court issued this ruling, plaintiffs' counsel stated: "Thank you, your Honor." By contrast, defense counsel voiced his "continuing objection." The trial court noted that it would "recognize the continuing objection" by defense counsel "to preserve the issue" for appeal.[6]

---

[6]Ordinarily, continuing objections are not recognized unless the trial court indicates its

No. 1-06-1859

The Illinois Supreme Court has held that, under " 'the doctrine of invited error' ", a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " People v. Harvey, 211 Ill. 2d 368, 385 (2004), quoting People v. Carter 208 Ill. 2d 309, 319 (2003). To permit a party to use, as a vehicle for reversal, the exact action which it procured in the trial court " 'would offend all notions of fair play' " and encourage duplicity by litigants. Harvey, 211 Ill. 2d at 385, quoting People v. Villareal, 198 Ill. 2d 209, 227 (2001). Thus, when a party "procures, invites or acquiesces" to a trial court's evidentiary ruling, even if the ruling is improper, he cannot contest the ruling on appeal. People v. Bush, 214 Ill. 2d 318, 332 (2005); Harvey, 211 Ill. 2d at 386; People v. Caffey, 205 Ill. 2d 52, 114 (2001).

In the case at bar, plaintiffs invited, or at the very least acquiesced to, the trial court's ruling to admit the two statements for impeachment purposes only. With respect to the first statement, plaintiffs asked the trial court to admit it for impeachment purposes, and the trial court did exactly that. With respect to the second statement, when the trial court ruled it admissible for impeachment purposes only, plaintiffs thanked the court for its ruling. While defense counsel objected to preserve the issue for appeal, plaintiffs stood by and voiced no objection. Plaintiffs' lack of an objection was not surprising since they thought they were "winning." After inviting and acquiescing to the trial court's rulings, plaintiffs cannot now complain about these same rulings on appeal.

recognition of the continuing objection, which was done here. DeBow v. City of East St. Louis, 158 Ill. App. 3d 27, 37 (1987).

22

### 3. Evidence of Financial Incentive

Plaintiffs' third claim on appeal is that the trial court abused its discretion by refusing to allow evidence that defendant Dr. Settecase allegedly had a financial incentive to withhold a referral to a cardiologist. Prior to ruling, the trial court permitted plaintiffs to make an offer of proof. The offer took the form of a voir dire at which plaintiffs questioned defendant Dr. Settecase outside the presence of the jury.

At the voir dire, defendant Dr. Settecase testified as follows: He was a member of defendant Midwest Physicians Group (MPG); defendant MPG had an agreement with HMO Illinois concerning a capitation pool; and at some point he learned that Mount was a member of HMO Illinois. The capitation pool was a fixed amount of money paid to defendant MPG, for providing medical services to the members of HMO Illinois. The cost of a referral diminished the amount of funds in the pool. At the end of the year, if there were funds remaining in the pool, they went to "a department fund and whatever department expenses were at that time." So, the amount of funds remaining in the pool, minus any expenses, determined the amount of the year-end bonus, if there was one, for the doctors in a particular department.

Defendant Dr. Settecase further testified that he learned that Mount was a member of HMO Illinois, in connection with signing a referral form in February 1999 for Mount to see a cardiologist. An appointment with a cardiologist was scheduled for March 5, 1999. Defendant Dr. Settecase testified that there was never a request for a cardiologist for Mount that he refused. He guessed that in February 1999, approximately half the patients that he saw were covered by some sort of capitation agreement.

23

After listening to defendant Dr. Settecase's testimony at the <u>voir</u> <u>dire</u>, the trial court made the following ruling:

> "All right. With respect to the issue regarding capitation pool, there was some concerns about the impact of the evidence with respect to insurance and things like that. The Illinois Supreme Court in the <u>Neade</u> case [<u>Neade v. Portes</u>, 193 Ill. 2d 433 (2000)] did say that in the court's discretion evidence regarding capitation pool can be presented. In this situation, we have evidence that a referral was made. Therefore, under the circumstances, at my discretion, I find that the [sic] while prejudicial to Dr. Settecase, I believe it would be prejudiced to him regarding the capitation pool outweighs the probative value in light of the referral. So, I will allow the voir dire to serve as an offer of proof."

The transcript provided to this court on appeal has the trial court concluding with: "You are allowed to question Dr. Settecase in front of the jury regarding the capitation pool." For the purposes of considering this issue on appeal, this court assumes that this sentence contains some sort of typographical error, such as omitting a "not." We make this assumption because, first, the sentence as written contradicts the trial court's conclusion that the prejudice from the evidence outweighed its probative value of the evidence; and, second, all the parties on appeal agree that the trial court did not permit introduction of the contested evidence at trial.

As noted, the trial court refused to admit the evidence because it concluded that the

prejudice from the evidence outweighed its probative value. Even when evidence is relevant, a trial court may exclude it, if the prejudicial effect of the evidence substantially outweighs its probative value. People v. Lewis, 165 Ill. 2d 305, 329 (1995). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. Lewis, 165 Ill. 2d at 329. Prejudice is an undue tendency to suggest a decision on an improper basis. Lewis, 165 Ill. 2d at 329.

Plaintiffs argued for admissibility, both at the trial level and on appeal, based on our supreme court's decision in Neade v. Portes, 193 Ill. 2d 433 (2000). In Neade, our supreme court held that a patient could not bring a breach of fiduciary duty claim against his physician and remanded the case for further proceedings. Neade, 193 Ill. 2d at 450-51. Anticipating a trial on the remaining medical negligence claims, our supreme court held that if the defendant doctor testified, the trial court "may" find that evidence of the "Medical Incentive Fund" was "relevant." Neade, 193 Ill. 2d at 450. The "Medical Incentive Fund" in Neade worked similarly to the capitation fund described by defendant Dr. Settecase in the case at bar. Neade, 193 Ill. 2d at 437. Our supreme court held that "[t]he relevance and admission of such evidence is for the discretion of the trial court." Neade, 193 Ill. 2d at 450.

In addition to holding that an abuse-of-discretion standard applied, our supreme court also held that the capitation fund evidence was relevant for impeachment purposes only. Neade, 193 Ill. 2d at 450. The appellate court in Neade had held that "allegations relating to financial motive are not appropriate in a medical negligence [case]," but found that the evidence "may be relevant

at trial to attack [defendant doctor's] credibility if he testifies." Neade, 193 Ill. 2d at 439. After restating the appellate court's holding, our supreme court held: "We agree." Neade, 193 Ill. 2d at 450. Our supreme court then held that the evidence was relevant only if the doctor testified at trial, noting that generally a witness may be cross-examined concerning interest and bias, and the issues concerning the defendant doctor's financial gain went to his credibility. Neade, 193 Ill. 2d at 450. Based on our supreme court's holdings in Neade, the issue before us is whether the trial court abused its discretion in refusing to admit the evidence for impeachment purposes.

We cannot find that the trial court abused its discretion. The probative value of the evidence was very low because, as the trial court stressed in making its ruling, defendant Dr. Settecase did, in fact, make a referral. Defendant Dr. Settecase testified at the voir dire that there was never a time when he was asked to issue a referral and refused. Thus, even if the capitation fund provided a disincentive to issue referrals, it had little effect on defendant Dr. Settecase. The case at bar is distinguishable from Neade, where the defendant doctor repeatedly refused to issue a referral for an angiogram, despite recommendations from two of his own staff physicians to do so. Neade, 193 Ill. 2d at 436-37. As a result, the trial court in the case at bar did not abuse the discretion afforded to it by our supreme court. Neade, 193 Ill. 2d at 450.

### 4. HMO Evidence

Plaintiffs' fourth claim on appeal is that the trial court abused its discretion by refusing to admit evidence that Mount belonged to an HMO. Prior to trial, defendants Midwest and Dr. Settecase moved in limine to bar reference to insurance, including Mount's membership in an

HMO[7]; and the trial court granted the motion. On appeal, plaintiffs claim that the fact of Mount's HMO membership was important: (1) to explain why Mount did not seek a cardiology appointment on his own; and (2) to rebut defendant's alleged attempts to suggest that Mount had a patient-doctor relationship with Dr. Hamid, the cardiologist who reviewed the strips generated at the Ingalls Wellness Center.

Defendants first argue that plaintiffs waived this claim by failing to make an offer of proof at trial. Plaintiffs acknowledge that the ruling on the motion in limine did not preserve the issue for our review. It is well-settled law that a motion in limine does not excuse the requirement to make an offer of proof. Bergman v. Kelsey, 375 Ill. App. 3d 612, 635 (2007); Sullivan-Coughlin v. Palos Country Club, Inc., 349 Ill. App. 3d 553, 561 (2004).

Our supreme court has held that if the trial court excludes evidence, the proponent of the evidence must "normally" make an offer of proof in the trial court, in order to preserve the issue for appeal. In re Leona W., 228 Ill. 2d 439, 461 n.5 (2008); Dillon v. Evanston Hospital, 199 Ill. 2d 483, 495 (2002). "The purpose of an offer of proof is to inform the trial court, opposing counsel, and [the] reviewing court of the nature and substance of the evidence sought to be introduced." Dillon, 199 Ill. 2d at 495.

---

[7]Specifically, in section H of the first motion in limine by defendants Dr. Settecase and Midwest, they asked the court: "To bar reference to existence of any insurance at trial, including the fact that defendant [sic] are insured. Specifically any reference to the fact that Mr. Mount had an HMO and the requirements that insurance entails."

However, our supreme court has also held that "an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced." Dillon, 199 Ill. 2d at 495, cited with approval in In re Leona W., 228 Ill. 2d at 461 n.5. In Dillon, our supreme court stated that, in the case before it, "an offer of proof was not required because the trial court understood that Dr. Raaf [the proposed witness] would testify as to the medical standard of care." Dillon, 199 Ill. 2d at 495. Thus, an offer of proof was not required in Dillon because the trial court knew both the identity of the proposed witness and the subject matter of his proposed testimony.

Similarly, in the case at bar, an offer of proof was not required, because the trial court knew both the identity of the proposed witness and the subject matter of his proposed testimony. When the trial court granted defendants' motion in limine, the trial court stated: "All I'm saying is that without mentioning HMO the guy can testify our procedure is [to] refer to another physician. I don't see the relevance of mentioning HMO or any insurance at this point." Since counsel and the court had just been discussing defendant Dr. Pawlowski and defendant Dr. Settecase's referral of Mount to a cardiologist, the trial court's reference to "the guy" was presumably to one of these two doctors. Thus, the proposed testimony was very specific: "mentioning HMO" in connection with the doctors' referral of Mount to a cardiologist. No offer of proof was needed because the trial court knew, very specifically, the substance of the proposed testimony.

In addition, the substance of the proposed testimony was not in dispute. The appellate court has held that: "A statement by counsel may be a sufficient offer of proof when the offered

evidence is obvious and when neither opposing counsel nor the court disputes counsel's statement." Lagestee v. Days Inn Management Co., 303 Ill. App. 3d 935, 941 (1999); see also Snelson v. Kamm, 204 Ill. 2d 1, 23 (2003) (counsel's statement, if particular, may qualify as an adequate offer of proof). In the case at bar, none of the parties disputed the fact that Mount belonged to an HMO and that in order for a cardiology appointment to be covered by his HMO insurance, he had to first obtain a referral from his primary care physician. Thus, this issue was not waived by plaintiffs' failure to make an offer of proof with respect to this obvious and undisputed evidence.

Defendants next argue that plaintiffs waived this claim by failing to raise the issue at trial after the trial court remarked: "We will just see what the future cross *** brings out." At that time, the trial court was referring to the cross-examination of Lora Stancik, the first witness at trial.

During direct examination, Stancik, an exercise physiologist, testified that she had performed a stress test on Mount at the Ingalls Wellness Center on February 6, 1999, and had told Mount to see his physician "as soon as possible." During cross-examination by defendants Olympia Fields, Dr. Freund and Dr. Pawloski, Stancik was asked the following question:

> "Q. So you didn't call Dr. Hamid[8] to talk about these or fax
>
> these results to him, you just had them brought over in the normal

---

[8]Dr. Hamid was the cardiologist employed at Ingalls to read the strips generated by the stress tests.

course like all the – like the other EKGs you had done that

morning, right?

A. Right."

This question later became the subject of a sidebar. After the first cross-examination was finished but before the second cross-examination started, the following sidebar occurred concerning this question:

"MR. HEALEY [Plaintiffs' Attorney]: [Y]our honor, there was a motion for us to exclude all HMO's and things like that. What counsel has done is force us really to come back and explain why he didn't go to Ingalls and why he didn't go to Hamid. That's the problem. He is not – he's not allowed to, he's in this HMO that covers the medical group.

\* \* \*

MR. KOPTIK [Attorney for Defendants Olympia Fields, Dr. Freund and Dr. Pawloski]: Well, I mean, first I don't know how HMO is getting in this because she can't refer anyone to anywhere. \*\*\*

THE COURT: Well, your question, did you call Hamid personally or did you send him ASAP.

\* \* \*

MR. SLOVIS [Attorney for Defendants Dr. Settecase and

Midwest]: But the issue, your Honor, in that respect was not where he was supposed to go because she said go see your doctor. She could have said go see anyone. The issue with that line of questioning was, was there an emergent nature that he had to go see someone as soon as possible. Did you talk to Dr. Hamid about an emergent problem, did you send him somewhere. But nothing with HMOs or limiting referral.

THE COURT: Well, at this point, I would agree with you. We will just see what the future cross [sic] that brings out."

After the trial court stated that "[w]e will just see what the future cross *** brings out," defendants Dr. Settecase and Midwest proceeded with their cross-examination of Ms. Stancik. During the subsequent cross-examination, Ms. Stancik was asked if she "could have referred" Mount to a hospital. Although plaintiffs voiced no objection, the trial court called for an immediate sidebar where it admonished counsel to stay away from the subject of HMOs.

During the sidebar, plaintiffs' attorney said that he thought defense counsel had opened the door. The trial court told plaintiffs' attorney: "Well, one other rule which I didn't tell you about [is] if you think the door is open, you have to check with the gatekeeper first." Despite that invitation to "check with the gatekeeper," plaintiffs' attorney said nothing further. At that point, plaintiffs waived their objection.

The law in Illinois is well established that, to preserve any alleged error for appeal, a party must object specifically both at trial and in a posttrial motion. People v. Woods, 214 Ill. 2d 455,

31

470 (2005). If a party fails to do either, the issue is considered waived on appeal. Woods, 214 Ill. 2d at 470. In the case at bar, plaintiffs did raise the issue in a posttrial motion, but they waived the issue by failing to check with the "gatekeeper" at trial.

### 5. Jury Instruction About Issues

Plaintiff's fifth claim on appeal is that the trial court refused, in the issues instruction, to instruct the jury to consider plaintiffs' claim that defendant Dr. Settecase was negligent in failing to obtain the rhythm strips from Mount's stress test, if Dr. Settecase did not already have them.

The issues instruction stated, in relevant part:

> "Ladies and gentlemen, plaintiff claims that David Mount
> was injured and sustained damage and that the defendants were
> negligen[t] in one or more of the following respects. As to
> defendant Olympia Fields Hospital through Dr. Freund, failed to
> obtain the rhythm strips, if he did not possess them, failed to refer
> to a cardiologist concerning David Mount's abnormal stress test
> and failed to do a proper differential diagnosis and rule out heart
> disease.
>
> As to defendant Olympia Fields Hospital through Dr.
> Pawloski, on February 18, 1999 failed to obtain the rhythm strips if
> he did not possess them, or on February 18th and March 1st, 1999
> failed to immediately refer to a cardiologist concerning David
> Mount's abnormal stress test, or failed to place David Mount in a

hospital or under supervised care if a cardiologist was not available.

As to defendant Midwest Physicians Group, Ltd. through Dr. Michael Settecase, failed to refer to a cardiologist on or about February 8, 1999 concerning David Mount's abnormal stress test, or failed to immediately refer to a cardiologist on February 18, 1999 concerning David Mount's abnormal stress test, or failed to place David Mount in a hospital or under supervised care if a cardiologist was not available."

Thus, the trial court did instruct the jury to consider whether defendants Dr. Freund and Dr. Pawlowski were negligent in failing to obtain the strips, but the trial court did not provide a similar instruction with respect to Dr. Settecase. That omission is the error claimed on appeal.

During the jury instruction conference, defense counsel made the following argument with respect to Dr. Settecase. Defense counsel noted that during direct examination, Dr. Brown, plaintiffs' medical expert,[9] testified that the standard of care required Dr. Settecase to obtain the strips. However, during cross-examination, Dr. Brown also testified that it did not matter[10]

---

[9]Dr. Finley Webster Brown testified that he was a board-certified family practice physician. Dr. Brown also testified that his opinions with respect to Dr. Settecase were based on the standard of care, to a reasonable degree of medical certainty.

[10]Dr. Brown could not have been more emphatic, stating: "It doesn't matter whether you

whether Dr. Settecase had the strips or not,[11] because based solely on the chart prepared by Dr. Freund, Dr. Settecase had a duty to refer Mount to a cardiologist. Thus, there was no causation between a possible lack of strips and Dr. Settecase's alleged failure to refer Mount to a cardiologist. The trial court agreed, stating: "the bottom line is that based upon the presentation of Mr. Mount, that Settecase had an obligation just on the chart from the 8th prepared by Freund, that he should have referred him to a cardiologist."

"It is within the circuit court's discretion to determine what issues are raised by the evidence and whether an instruction should be given." Mack v. Anderson, 371 Ill. App. 3d 36, 56 (2006); Snelson v Kamm, 204 Ill. 2d 1, 27 (2003) (" 'The question of what issues have been raised by the evidence is within the discretion of the trial court.' "), quoting Leonardi v. Loyola University of Chicago, 168 Ill. 2d 83, 100 (1995). As previously noted, a reviewing court will not reverse a trial court, even if the trial court gave faulty instructions, unless the instruction clearly misled the jury and resulted in prejudice to the appellant. Schultz, 201 Ill. 2d at 274. In the case at bar, it is very difficult to find what prejudice plaintiffs could have suffered when their own medical expert testified that "[i]t doesn't matter." See Snelson, 204 Ill. 2d at 48-49 (a

have the Ingalls chart or not."

[11]Defendant Dr. Pawlowski also testified that the strips would not have made a difference, stating: "Had I seen those strips [on February 18], I would have treated him for pneumonia, which I did."

failure to communicate information to a treating physician is not necessarily a jury issue where expert testimony did not establish the failure as a proximate cause).

### 6. Manifest Weight of the Evidence

Plaintiffs' sixth claim on appeal is that the jury verdict was against the manifest weight of the evidence. Our supreme court has admonished its appellate courts that, when reviewing an appeal from a jury verdict, the appellate court "may not simply reweigh the evidence and substitute its own judgment for that of the jury." Snelson, 204 Ill. 2d at 35. An appellate court may reverse a jury verdict "only if it is against the manifest weight of the evidence." Snelson, 204 Ill. 2d at 35. Our supreme court has held that "[a] verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." Snelson, 204 Ill. 2d at 35.

In the case at bar, the sole cause of action alleged against all defendants was medical negligence. In a medical negligence action, a plaintiff must prove the following three elements: (1) the proper standard of care by which to measure defendants' conduct; (2) a negligent breach of that standard of care by defendants; and (3) proximate cause. Bergman v. Kelsey, 375 Ill. App. 3d 612, 621 (2007).

With respect to the third element, a plaintiff must satisfy two requirements: cause in fact and legal cause. Bergman, 375 Ill. App. 3d at 625. First, to prove cause in fact, a plaintiff must show, within a reasonable degree of medical certainty, that defendants' breach of the standard of care was more probably than not a proximate cause of the resulting injury. Bergman, 375 Ill. App. 3d at 621, 625. Second, to prove legal cause, a plaintiff must also show that "an injury was

forseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." Bergman, 375 Ill. App. 3d at 625.

Ordinarily, the proof of all three elements in a medical negligence action requires the testimony of medical experts. Bergman, 375 Ill. App. 3d at 621, 625; Snelson, 204 Ill. 2d at 43-44. It is normally the role of the jury to assess the credibility of the medical experts and to determine the value of their testimony. Bergman, 375 Ill. App. 3d at 625-26; Snelson, 204 Ill. 2d at 36. When the experts conflict, the jury is expected to resolve the conflict by evaluating the relative merits of the experts and their opinions, and decide the weight to be given to their testimony. Bergman, 375 Ill. App. 3d at 626; Snelson, 204 Ill. 2d at 36.

What we have here is a case of dueling experts. For example, plaintiffs' medical experts testified that Mount's cardiac arrest on March 2, 1999, was due to cardiomyopathy which was already present on February 6, 1999; that a referral on February 8 or February 18 for Mount to see a cardiologist on that same day or the next day would have, very likely, prevented the cardiac arrest on March 2; and that the standard of care required an immediate referral. By contrast, defendant's medical experts testified that Mount's cardiac arrest on March 2 was due to a viral myocarditis that would not have been detected by a cardiologist and thus would not have been prevented by a referral to a cardiologist; and that the standard of care did not require an immediate referral.

When both parties offer conflicting expert testimony about the appropriate standard of care, the alleged breaches and the proximate cause of injury, the conflicting testimony is sufficient to raise a question of fact that the jury decides. Bergman, 375 Ill. App. 3d at 622-23;

Snelson, 204 Ill. 2d at 36. As this court has stated many times in the past, "this court will not substitute its judgment for that of the jury and reweigh the credibility of the witnesses." Bergman, 375 Ill. App. 3d at 622-23; Snelson, 204 Ill. 2d at 36.

In Snelson, as in the case at bar, our supreme court was faced with a medical negligence action involving " 'a classic battle of the experts" Snelson, 204 Ill. 2d at 36. In Snelson, our supreme court could find "no 'scientific poverty' " in the testimony of defendants' experts "that would put the jury verdict in doubt." Snelson, 204 Ill. 2d at 36. In the case at bar, plaintiffs in their appellate briefs do not contest the expertise of the defense witnesses, rather plaintiffs simply relate the story from the vantage point of their own expert witnesses. We also cannot locate the "scientific poverty" in the defense expert testimony, and thus must affirm. Snelson, 204 Ill. 2d at 36.

We feel a tremendous amount of sympathy for plaintiff Georgianne Calandriello, the fianceé of the now-disabled David Mount. But her recovery does not lie within the legal system.

CONCLUSION

In sum, we have reviewed carefully plaintiffs' six claims on appeal, and we are not persuaded that these claims warrant reversal. First, plaintiffs suffered no prejudice when the trial court gave a jury instruction for medical negligence that was a hybrid of both the current and the prior pattern jury instructions. Second, we cannot find that the trial court abused its discretion by admitting the discovery deposition testimony of defendant Dr. Settecase for impeachment purposes only, when plaintiffs invited or, at least, acquiesced in that ruling. Third, the trial court did not abuse its discretion by refusing to allow evidence that defendant Dr. Settecase allegedly had a financial incentive to withhold a referral to a cardiologist, when there was no evidence in the record that Dr. Settecase was ever asked to make a referral and refused.

Fourth, the trial court's refusal to admit evidence of Mount's HMO membership was an issue that plaintiffs waived for purposes of appeal, when the trial court invited plaintiffs "to check with the gatekeeper" and plaintiffs did not check. Fifth, the trial court did not abuse its discretion by refusing to instruct the jury about plaintiffs' claim that defendant Dr. Settecase was negligent by failing to obtain the strips from Mount's stress test, when plaintiffs' own medical expert testified that it did not matter whether the doctor had the strips or not. Sixth, the jury verdict was not against the manifest weight of the evidence, where this was a case of dueling experts and it was the jury's role to resolve the conflict in their testimony. For the foregoing reasons, we affirm the judgment of the trial court and the jury verdict.

Affirmed.

WOLFSON and GARCIA, JJ., concur.

### REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
#### (Front Sheet to be attached to each Opinion)

| Please use the following form: ] | |
|---|---|
| ] | LASALLE BANK, N.A., as Successor of The Chicago Trust Company, as Plenary Guardian of the Estate of David Mount, a Disabled Person, and GEORGIANNE CALANDRIELLO, as Legal Guardian of David Mount, |
| ] | |
| ] | Plaintiffs-Appellants, |
| ] | v. |
| ] | |
| ] | C/HCA DEVELOPMENT CORPORATION, d/b/a Columbia Olympia Fields Osteopathic Hospital and Medical Center, LEE FREUND, THOMAS PAWLOWSKI, MICHAEL SETTECASE, and MIDWEST PHYSICIAN GROUP, LTD., |
| ] | |
| ] | Defendants-Appellees. |
| Complete TITLE of Case. ] | |

| Docket No. ] | No. 1-06-1859 |
|---|---|
| ] | Appellate Court of Illinois |
| COURT ] | First District, First Division |
| ] | |
| ] | AUGUST 04, 2008 |
| Opinion Filed ] | (Month, Day and Year) |

| JUSTICES | ] JUSTICE ROBERT E. GORDON delivered the opinion of the court. |
|---|---|
| | ] |
| | ] WOLFSON and GARCIA, JJ., concur. |
| APPEAL from the Circuit Court of Cook County; the Hon:_____ | ] Lower Court and Trial Judge(s) in form indicated ] in margin: ] Appeal from the Circuit Court of Cook County. ] |
| Judge Presiding | ] Honorable   Daniel M. Locallo, Judge Presiding. |
| For APPELLANTS John Doe of Chicago. | ]Indicate if attorney represents APPELLANTS or ]APPELLEES and include attorneys of counsel. ]Indicate the word NONE if not represented. |
| For APPELLEES, Smith and Smith, of Chicago. Brown, of Counsel. | ]------------------------------------------------------------------------------- ] ] ] ] ] |
| | ]              SEE PAGE 2 FOR ATTORNEYS OR RECORD. |
| Also add atty. for third party appellants or appellees. | ] ] ] ] ] |

|  |  |
|---|---|
| | ] ---------------------------------------------------------------------- |
| | ]       COUNSEL FOR APPELLANTS |
| | ] |
| | ]       William J. Harte, Ltd. |
| | ]       Chicago, Illinois   60602 |
| | ]       Attorneys for Appellants |
| | ] |
| | ]       The Healy Law Firm |
| | ]       Chicago, Illinois   60602 |
| | ]       Attorneys for Appellants |
| | ] |
| | ]       Attn: Martin J. Healy, Jr., J.T. Terence Geoghegan, |
| | ]           William J. Harte and Joan M. Mannix |
| | ]             OF COUNSEL |
| | ] |
| | ] ---------------------------------------------------------------------- |
| | ]       COUNSEL FOR APPELLEES |
| | ] |
| | ]       Cunningham, Meyer & Vedrine, P.C. |
| | ]       Warrenville, Illinois   60555 |
| | ]       Attorneys for Appellees, Michael Settecase, D.O. and |
| | }       Midwest Physician Group, Ltd. |
| | ]       Attn: Michael R. Slovis, Peter J. Strauss and Robert L. Larsen |
| | ]             OF COUNSEL |
| | ] |
| | ] |
| | ]       Hall, Prangle & Schoonveld, LLC |

Chicago, Illinois 60606
Attorneys for Appellees, Lee Freund, D.O., Thomas Pawlowski, M.D.,
and C/HCA Development, Inc., f/k/a Columbia Olympia
Fields Osteopathic Hospital and Medical Center.
Attn: Michael E. Prangle, Hugh C. Griffin, and Jacob Z. Goldstein
     OF COUNSEL


Pretzel, Stouffer, Chartered
Chicago, Illinois 60606
Amicus Curiae Brief of the Illinois Association of Defense Counsel
In Support of Defendants-Appellees.
Attn: Robert Marc Chemers and David S. Osborne
     OF COUNSEL


Pfaff & Gill, Ltd.
Chicago, Illinois 60601
Illinois Trial Lawyers Association Brief Amicus Curiae
Attn: Bruce R. Pfaff, Chair, ITLA's Amicus Curiae Committee
     OF COUNSEL

_____(USE REVERSE SIDE IF NEEDED_____